## GEORGE M. REIDER, JR., INSURANCE COMMISSIONER *v.* ARTHUR ANDERSEN, LLP

Superior Court      Complex Litigation Docket    File No. CV980151625S
at Waterbury

Memorandum filed January 31, 2001

*Bingham, Dana & Gould* and *Weinstein & Wisser*, for the plaintiff.

*Rome, McGuigan, Sabanosh* and *Mayer, Brown & Platt*, of the Illinois bar, for the defendant.

SHELDON, J. In this case, plaintiff George M. Reider, Jr., Insurance Commissioner of the State of Connecticut ("Commissioner" or "Liquidator"), has brought suit against the accounting firm of Arthur Andersen, LLP ("Andersen") in his capacity as Liquidator of First Connecticut Life Insurance Company ("First Connecticut"). In so doing, the Liquidator seeks to recover damages from Andersen for the estate of First Connecticut based on Andersen's alleged role in misreporting the true financial status of First Connecticut to the State Insurance Department from 1992 through 1994, and thus in keeping First Connecticut in business—issuing new insurance policies, incurring new debt, and thereby compromising the rights and interests of its creditors and policyholders—long after it had become insolvent and should have been placed in receivership.

In his Revised Complaint dated June 3, 1998, the Liquidator alleges, more particularly, that Andersen failed to disclose, in the annual audited financial statements it prepared for First Connecticut to file with the State Insurance Department from 1992 through 1994, that First Connecticut's largest single asset was worthless even though Andersen knew or recklessly disregarded the fact that it was worthless. The asset in question was an account receivable from an affiliate of First Connecticut by the name of Capital Benefit Plans, Inc. ("Capital Benefit"). The Liquidator alleges that at all times relevant to this case, both Capital Benefit and First Connecticut were wholly owned, controlled and

operated by Robert Edwin Chain and Helen Levy Chain, a married couple. The Chains allegedly conducted virtually the entire business of First Connecticut through Capital Benefit, and in so doing, siphoned off a substantial amount of First Connecticut's funds, looted First Connecticut for their personal gain, and operated First Connecticut while it was insolvent.

Andersen allegedly performed auditing services for both Capital Benefit and First Connecticut in the relevant time frame. Based upon its audits of Capital Benefit, Andersen issued certified financial statements for that company which showed that it was insolvent. Contemporaneously, however, Andersen issued certified financial statements for First Connecticut which misleadingly listed a large account receivable from Capital Benefit on its balance sheet, not as an uncollectible obligation from an insolvent debtor, but as an admitted asset at full value. Andersen, it is claimed, not only prepared such misleading reports for First Connecticut to file with the Insurance Department, but had its representatives meet personally with Department staff in August of 1994 to assure them that the Capital Benefit receivable was indeed collectible. By such conduct, claims the Liquidator, Andersen enabled First Connecticut's owners to continue looting First Connecticut for their personal gain long after it would have been required to cease its operations and been placed in receivership had its true financial condition been properly reported as the law required.

On the basis of these allegations,[1] the Liquidator makes two sets of claims against defendant Andersen.

[1] The Liquidator has structured his Revised Complaint as follows. He begins with a lengthy preface, containing thirty-eight serially numbered paragraphs separated into sub-parts entitled Introduction, Parties, and Factual Background. Then he sets forth his claims against defendant Andersen in nine separate counts, each of which starts by realleging all the allegations of the preface as its first thirty-eight paragraphs, and concludes by pleading several additional allegations in support of the discrete claim or cause of action made in that count.

The first three counts of his Revised Complaint—which sound, respectively, in breach of contract (First Count), negligence (Second Count), and aiding and abetting breach of fiduciary duty (Third Count)—are all brought by the Liquidator "[a]s to First Connecticut." The Liquidator is clearly authorized to prosecute any valid claim for damages by an insurer in liquidation against a third party under subsections (a) (6) and (12) of General Statutes § 38a-923, which provide in relevant part as follows: "(a) The liquidator shall have the power . . . (6) to collect all debts and moneys due and claims belonging to the insurer, wherever located, and for this purpose . . . (C) to pursue any creditor's remedies available to enforce the creditor's claims . . . [and] (12) . . . to institute in the name of the insurer or in the liquidator's own name any and all suits and other legal proceedings, in this state or elsewhere, and to abandon the prosecution of claims he deems unprofitable to pursue further. . . ." In prosecuting such a claim, the Liquidator "stands in the shoes" of the insolvent insurer, since each such claim is purportedly one that the insurer itself could prosecute if it were not in liquidation.

The last six counts of the Revised Complaint, by contrast, are brought by the Liquidator "[a]s to First Connecticut, Its Policyholders and Creditors." In bringing such claims—which sound, respectively, in negligent misrepresentation (Fourth Count), recklessness (Fifth Count), intentional misrepresentation (Sixth Count), aiding and abetting breach of fiduciary duty (Seventh Count), aiding and abetting fraud (Eighth Count), and violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), General Statutes § 42-110g, (Ninth Count)—the Liquidator asserts that he is attempting to prosecute the "common claims" of the policyholders and creditors—that is, claims the estate can assertedly prosecute on behalf of its policyholders

and creditors of First Connecticut because of their special, statutorily protected interest in the continuing solvency of First Connecticut. The Liquidator claims authority to prosecute these claims under §§ 38a-923 (a) (13) and (19) and 38a-923 (b), which provide as follows: "(a) The liquidator shall have the power . . . (13) to prosecute any action which may exist on behalf of the creditors, members, policyholders or shareholders of the insurer against any officer of the insurer or any other person . . . [and] (19) to exercise and enforce all the rights, remedies, and powers of any creditor, shareholder, policyholder, or member, including any power to avoid any transfer or lien that may be given by the general law and that is not included with sections 38a-928 to 38a-930, inclusive . . . .

"(b) The enumeration in this section, of the powers and authority of the liquidator shall not be construed as a limitation upon him, nor shall it exclude in any manner his right to do other acts not specifically enumerated, or otherwise provided for, as may be necessary or appropriate for the accomplishment of or in aid of the purpose of liquidation."

The case is now before the Court for decision on Andersen's Motion to Strike Plaintiff's Revised Complaint ("Motion"). In the Motion, Andersen attacks each and every count of the Revised Complaint on multiple grounds. First, it asserts that the Liquidator has no legal right to recover damages on any of his claims as to First Connecticut because, as those claims have been pleaded, First Connecticut itself could not prevail on them if it were not in liquidation. On this score, Andersen argues that First Connecticut is barred from prosecuting the challenged claims because they all seek damages for losses that allegedly resulted from First Connecticut's own fraudulent conduct.

Second, Andersen argues that the Liquidator lacks standing to prosecute any of the claims it has brought

on behalf of the policyholders and/or creditors of First Connecticut. Each such claim, asserts the defendant, is an individual claim that can only be prosecuted by one or more individual First Connecticut creditors or policyholders on his/their own behalf.

Third, Andersen challenges the sufficiency of the Liquidator's allegations of causation and reliance in the last six counts of the Revised Complaint.

Fourth and finally, Andersen asserts that even if the Liquidator could otherwise prosecute and prevail on any of his claims, eight of his nine counts must be stricken for failure to state a claim upon which relief can be granted.

After briefly discussing the standards under which motions to strike must be decided, the Court will first discuss the defendant's broad challenges to the Liquidator's authority to prosecute his claims, then discuss, as appropriate, its separate challenges to the surviving counts.

I

STANDARDS FOR DECIDING MOTIONS TO STRIKE

The motion to strike replaced the demurrer in our practice. Its function, like that of the demurrer, is to test the legal sufficiency of a pleading. See *Ferryman* v. *Groton*, 212 Conn. 138, 142, 561 A.2d 432 (1989).

In judging a motion to strike, the court must presume that all of the factual allegations of the challenged pleading are true, and must give them "the same favorable construction as a trier would be required to give in admitting evidence under them." (Internal quotation marks omitted.) Id. "[I]f facts provable under the allegations would support a defense or a cause of action, the . . . [motion to strike] must fail" even though facts outside of the pleadings may flatly disprove them or

otherwise render them legally insufficient to establish a valid claim or defense. (Internal quotation marks omitted.) Id.; see also *Liljedahl Bros., Inc.* v. *Grigsby*, 215 Conn. 345, 348, 576 A.2d 149 (1990); *Fraser* v. *Henninger*, 173 Conn. 52, 60, 376 A.2d 406 (1977).

## II

## ANDERSEN'S CHALLENGE TO THE LIQUIDATOR'S RIGHT TO PURSUE CLAIMS IN THE NAME OF FIRST CONNECTICUT

Andersen's initial claim is that the first three counts of the Liquidator's Revised Complaint must be stricken because they were brought as to First Connecticut.[2] The defendant does not contend that the Liquidator lacks legal standing to prosecute these claims, for as previously noted, the Liquidator is expressly authorized to prosecute them, either in his own name or in the name of the insurer, under § 38a-923 (a) (6) and (12). It argues that the Liquidator cannot prevail on any such claim because each seeks damages for harm allegedly suffered by First Connecticut as a result of the insurer's own fraudulent conduct.

It is axiomatic, claims the defendant, that a corporation acts through its officers, agents, and employees. Therefore, both the conduct of such persons, when acting within the scope of their duties, and the knowledge or intention with which they perform those duties, are typically imputed to the corporation itself. Where, then, as here, the fraudulent misreporting of a corporation's assets to State regulators is claimed to have been perpetrated by the corporation's own owners and officers, their fraud assertedly must be imputed to the corporation itself, which cannot equitably recover from a defendant whose only alleged role was facilitating the

---

[2] The defendant also challenges the last six counts of the Revised Complaint on this ground, to the extent that they were brought "[a]s to First Connecticut." See Part II of this opinion, infra, 208.

fraud by failing to blow the whistle on it when they had the opportunity to do so.

The Liquidator's response to this threshold challenge is that on the facts set forth in his Revised Complaint, First Connecticut could in fact prosecute the pending claims if it were not in liquidation. He insists that on those facts, First Connecticut cannot be held liable for the fraud of Robert and Helen Chain because at all times relevant to this case, their actions were adverse to the interests and in fraud of First Connecticut.

In making this argument, the Liquidator relies upon the "adverse interest exception" to the general rule imputing the knowledge and conduct of agents to their principals. Under that exception, which Connecticut courts have long recognized, "knowledge of an agent will not ordinarily be imputed to his principal where the agent is acting adversely to the latter's interest." *Mutual Assurance Co.* v. *Norwich Savings Society*, 128 Conn. 510, 513, 24 A.2d 477 (1942).

The logic of the "adverse interest exception" is completely consistent with that of the general rule imputing the knowledge and conduct of agents to their principals. The general rule is based on the presumption that an agent will be loyal to his principal, and thus will faithfully report to the principal whatever he learns "while acting for his principal and in reference to a matter in the course of his agency . . . ." *Resnik* v. *Morganstern*, 100 Conn. 38, 42, 122 A. 910 (1923). The principal is thus charged with his agent's knowledge because it is presumed that the principal will actually receive and have the benefit of the agent's knowledge contemporaneously with the agent's actions. The "adverse interest exception" suspends the operation of the general rule when "the circumstances are such as to raise a clear presumption that the agent will not perform [his] duty,"

and thus that the principal will not in fact receive and have the benefit of the agent's knowledge. Id., 43.

Our Supreme Court has identified three sets of circumstances in which the typical presumption that an agent has informed his principal can be rebutted: "(1) Where it is not the duty of the agent to disclose; (2) when the agent is acting adversely to the interest of his principal, whether for the interest of himself or a third party; [and] (3) where the agent is acting in fraud of his principal." Id.

In each of these situations, the reason for the exception is readily apparent. In the first, the agent's loyalty to his principal is unquestioned, but the scope of his duty to report information is strictly limited. An agent cannot be presumed to do more than his duty requires of him. In the second and third situations, by contrast, the agent's duty to communicate to his principal is clear, but his loyalty to the principal is cast very much in doubt. When an agent, by his self-serving conduct, so abandons his principal's interests as to act adversely to those interests, or worse, to act in fraud of his principal, it can fairly be said "that, pro tanto, the agency really cease[s]." Id. When that occurs, the *Resnik* Court declared, " 'the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them, or having received notice of them, failed to disavow what was assumed to be said and done in his behalf.' " Id., 43–44, quoting *American Surety Co.* v. *Pauly*, 170 U.S. 133, 156, 18 S. Ct. 552, 42 L. Ed. 977 (1898). Thus, though a "party [who] knowingly receives and retains a benefit from the transaction which is tainted with fraud . . . cannot claim that benefit and disavow knowledge of the fraud[,] . . . a party [who] receives no benefit from the transaction, . . . will not be charged with knowledge of the fraud." *Mutual Assurance Co.* v. *Norwich Savings Society*, supra, 128 Conn. 513–14.

Under these authorities, when a corporate officer or agent engages in fraudulent conduct for the distinctly private purpose of lining his own pockets at his corporation's expense, it is unlawful, as well as illogical, to impute the agent's guilty knowledge or disloyal, predatory conduct to his corporate principal. Unless the agent's activity in pursuit of that scheme somehow benefits the corporation, the corporation cannot be made responsible for the agent's fraud.

In this case, claims the Liquidator, the conduct of Robert and Helen Chain was designed exclusively to loot their principal, First Connecticut, for their own personal financial gain. Monies due to First Connecticut for insurance policies it sold were routinely directed to Capital Benefit, the affiliated corporation they also owned and controlled. From there, the money was removed for a wide array of private purposes, including personal investments and expenses of all kinds, with no intent to return it to, or in any way to benefit, First Connecticut. This, then, was no scheme to attract new business *for* First Connecticut, based on false representations or like misconduct, which might have increased First Connecticut's assets even as it enriched the Chains. In such circumstances, First Connecticut itself would be chargeable with the Chains' fraudulent conduct, for the fraud would also have benefited the company itself, at least incidentally. Here, however, First Connecticut was merely the victim of the Chains' alleged fraud. It was propped up artificially, without sufficient assets, so it could continue to attract new business and obtain new credit, but with nary a thought of using any of it *for* First Connecticut. Therefore, claims the Liquidator, since the interests of the Chains were always adverse to those of First Connecticut, it cannot be charged with their fraudulent purpose in connection with those acts, or be denied the right to

seek damages from third parties who allegedly assisted the Chains to perpetrate their fraud against it.

The defendant acknowledges that Connecticut has adopted the "adverse interest exception" to the general rule imputing the knowledge and conduct of agents to their principals. It argues, however, that that exception does not apply here for two reasons. First, it asserts that First Connecticut was actually benefited by the Chains' fraudulent conduct, for its corporate life was assertedly extended by their fraudulent misrepresentations, and thus it continued to attract new customers, to write new insurance policies, and to earn new income for First Connecticut.

In the corporate looting scenario, however, such arguments have been rejected, and for good reason. As the United States Court of Appeals for the Seventh Circuit aptly explained in *Schacht* v. *Brown*, 711 F.2d 1343, 1348 (7th Cir.), cert. denied, 464 U.S. 1002, 104 S. Ct. 508, 78 L. Ed. 2d 698 (1983), such an argument simply ignores reality: "Defendants argue nonetheless that since the alleged fraudulent scheme had the effect of continuing [the insurer's] active corporate existence past the point of insolvency to the detriment of outside creditors and policyholders, [the insurer] was pro tanto benefited. But the fact that [the insurer's] existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income. Under such circumstances, the prolonged artificial solvency of [the insurer] benefited only [the insurer's] managers and the other alleged conspirators, not the corporation. . . . More colloquially put, if defendants' position were accepted, the possession of such 'friends' as [the insurer] had would certainly obviate the need for enemies. We do not believe that such a Pyrrhic 'benefit' to [the insurer] is sufficient to . . . trigger the . . . analysis which seeks to determine the propriety of imputing

to the corporation the directors' knowledge of fraud." (Citation omitted.) Id. Here, as in *Schacht*, the Court is persuaded that the only "benefit" derived from the artificial prolongation of First Connecticut's corporate existence inured to its owner-looters, Robert and Helen Chain. The company itself derived no benefit from its continuing service as their private piggy bank.

The defendant's second response to the Liquidator's invocation of the "adverse interest exception" is that that exception cannot reasonably be relied on where the agent who loots a corporation is its *sole* owner and shareholder. Two lines of logic support this "sole owner exception" to the "adverse interest exception." The first is that when a sole owner loots his own corporation, there is never a breakdown in communications between the agent and his principal. To the contrary, since the looter and his principal are one and the same person, the principal obviously knows what his "agent" knows at all times.

Secondly, even if the corporation as an entity is harmed by the owner's fraud, the owner himself, as the sole person whose economic interests are directly affected by the corporation's financial success or failure, obviously is not. As the corporation's sole owner and shareholder, he personally benefits from his own wrongdoing. He does so, moreover, without harming any other owner or shareholder, for by definition, there are none. In that sense, then, the looted corporation is not so much the owner's victim as it is his tool to defraud third parties. Many courts have held that in that situation, it is only fair to impute the self-dealing conduct of the looter to the looted corporation. See, e.g., *In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997); *Federal Deposit Ins. Corp.* v. *Ernst & Young*, 967 F.2d 166 (5th Cir. 1992).

The foregoing argument has considerable persuasive power. As applied to a typical corporation, whose essential purpose is to turn a profit for the benefit of its

owners and shareholders, it is a completely sensible and appropriate response by the court to any claim that a company should not be held responsible for its sole owner's self-serving fraud. As the only person who stands to gain or lose from the corporation's success or failure, a sole owner will not be deterred from his fraudulent course by an auditor or accountant who raises questions about the wisdom of his dealings or the accuracy of his financial records. Having engaged in his fraudulent dealings with his eyes wide open as to what he is doing, the owner will not rely upon third-party input in deciding how to manage his business. In addition, the owner will be unjustly enriched if the corporation is allowed to recover damages from a third party who merely failed to report his fraudulent conduct and sound the alarm.

The Liquidator's response to the foregoing argument, however, is that, while the "sole owner exception" to the "adverse interest exception" may make sense in the ordinary corporate context, where no other person with an interest in the corporation stands to gain or lose directly by his looting of the corporation, that exception cannot apply to an insurance company because of its unique legal responsibilities to policyholders, creditors, and the general public. The very existence of an insurance company is governed by a separate set of rules and statutes. The products it sells must be approved by State regulators, and the means by which they sell those products are strictly regulated, controlled and monitored, all in the public interest, by the State Insurance Department. The clients of insurance companies are typically presumed to be unsophisticated consumers, inexperienced in reading and understanding their insurance policies, and thus presumptively in need of special protection against unfairness and overreaching. Finally, and most importantly for present purposes, the

public's need for reliable insurance coverage is so substantial that its interest in the continuing solvency of insurers is afforded special legal protection through the State Insurance Commissioner.

During the life of the insurer, the Insurance Commissioner has the right and responsibility to receive and review annual audited financial statements from the insurer to assure himself that the public's interest in its continuing solvency is being protected.[3] If the Commissioner determines that the affairs of an insurer are being so mishandled as to threaten the public's vital interest in its continuing solvency, he is given sweeping statutory powers to take action to minimize that threat and avoid or lessen its potentially devastating consequences under the Insurers Rehabilitation and Liquidation Act ("Act"), which is now codified at General Statutes §§ 38a-903 to 38a-961, inclusive.

In its very first section, § 38a-903, the Act discloses its distinctly public purpose in the following language: *"Sections 38a-903 to 38a-961, inclusive, shall be construed to effect their purpose which is the protection of the interests of insureds, claimants, creditors and the public generally, with minimum interference with the normal prerogatives of the owners and managers of insurers, through:*

---

[3] See General Statutes § 38a-54, which provides in relevant part as follows: "(a) On or after December 31, 1990, each insurance company . . . doing business in this state shall have an annual audit conducted by an independent certified public accountant and shall annually file an audited financial report with the commissioner on or before the first day of June for the year ending the preceding December thirty-first.

"(b) The commissioner shall adopt regulations in accordance with the provisions of chapter 54 to: (1) Specify the scope of the examination required by this section; (2) specify the contents and scope of the annual audited financial report, provided such report shall include all incurred losses; (3) provide for the review of the controls; (4) provide for the availability to the commissioner of the workpapers of the certified public accountant; and (5) provide exemptions from compliance with the requirements of this section."

*"(1) Early detection of any potentially dangerous condition in an insurer and prompt application of appropriate corrective measures;*

"(2) Improved methods for rehabilitating insurers, involving the cooperation and management expertise of the insurance industry;

"(3) Enhanced efficiency and economy of liquidation, through clarification of the law, to minimize legal uncertainty and litigation;

"(4) Equitable apportionment of any unavoidable loss; [and] . . .

*"(7) Providing for a comprehensive scheme for the rehabilitation and liquidation of insurance companies and those subject to sections 38a-903 through 38a-961, inclusive, as part of the regulation of the business of insurance in the state. Proceedings in cases of insurer insolvency and delinquency are deemed an integral aspect of the business of insurance and are of vital public interest and concern."* (Emphasis added.) General Statutes § 38a-903.

The Act thus expressly recognizes and seeks to "protect . . . the interests of insureds, claimants, creditors and the public generally" from the damaging effects of insurer insolvency. General Statutes § 38a-903.

In the text of the Act, moreover, the legislature gave the Commissioner certain particularly powerful tools with which to protect the above-described interests. Included among them are the powers to initiate rehabilitation proceedings against the insurer,[4] to control and

---

[4] Under the Act, the Commissioner may petition the Court for an order authorizing him to rehabilitate a domestic insurer on any of several listed grounds, including that: "(a) *The insurer is in such condition that the further transaction of business would be hazardous, financially, to its policyholders, creditors or the public.*

"(b) *There is reasonable cause to believe that there has been embezzlement from the insurer, wrongful sequestration or diversion of the insurer's assets, forgery or fraud affecting the insurer, or other illegal conduct in, by, or with respect to the insurer that if established would endanger assets*

manage the insurer's affairs during the course of reha-
bilitation, in lieu of its own board of directors if neces-
sary,[5] and to initiate liquidation proceedings against
the insurer if rehabilitation efforts have not succeeded
or would be futile.[6] In sum, every move of an insurance
company is subject to regulatory oversight to preserve
its solvency in the public interest.

*in an amount threatening the solvency of the insurer. . . ."* (Emphasis
added.) General Statutes § 38a-914.

In brief, the mission of the rehabilitator is to restore the insurer's capacity
to function lawfully and on a sound financial basis. In exercising this respon-
sibility, the rehabilitator must "protect the estate of the insurer," always
acting "in the interests of justice and for the protection of creditors, policy-
holders and the public." General Statutes § 38a-917 (a).

[5] If the petition is granted, the Commissioner "as rehabilitator may take
such action as he deems necessary or appropriate to reform and revitalize
the insurer. *He shall have all the powers of the directors, officers and
managers, whose authority shall be suspended, except as they are redele-
gated by the rehabilitator.* He shall have full power to direct and manage,
to hire and discharge employees subject to any contract rights they may
have and to deal with the property and business of the insurer." (Emphasis
added.) General Statutes § 38a-916 (c).

[6] If the Commissioner, after attempting rehabilitation, comes to believe
"further attempts to rehabilitate an insurer would *substantially increase
the risk of loss to creditors, policyholders or the public,* or would be futile,
[he] may petition the Superior Court for an order of liquidation." (Emphasis
added.) General Statutes § 38a-918.

Indeed, he may file such a petition with this Court even without first
attempting rehabilitation on the basis: "(a) Of any ground for an order of
rehabilitation as specified in section 38a-914, whether or not there has been
a prior order directing the rehabilitation of the insurer;

"(b) *That the insurer is insolvent;* or

"(c) *That the insurer is in such condition that the further transaction
of business would be hazardous, financially or otherwise, to its policyhold-
ers, its creditors or the public."* (Emphasis added.) General Statutes
§ 38a-919.

If the Court grants the Commissioner's petition, it issues an order directing
him to liquidate the business of the insurer, appointing him as liquidator
and directing him to take possession of the assets of the insurer and to
administer them under the general supervision of the court. General Statutes
§ 38a-920 (a). As liquidator, the Commissioner is "vested by operation of
law with the title to all of the property, contracts, and rights of action and
all of the books and records of the insurer ordered liquidated, wherever
located, as of the entry of the final order of liquidation." General Statutes
§ 38a-920 (a).

Against this background, the defendant's argument that there is a complete unity of interest between a sole shareholder who loots his own insurance company and the company itself is clearly without merit. The public, through the Insurance Commissioner, has a vital interest in the continuing solvency of the insurer and the right, which it exercises through the Commissioner, to take over the insurer's business activities to protect that interest. Though the Commissioner is not an ex officio member of the insurer's Board of Directors, he is legally empowered not only to participate in, but to control the insurer's business activities whenever its solvency is threatened. General Statutes § 38a-916 (c).

Therefore, when a sole owner seeks to loot his own insurance company, every person with a legally protected interest in the insurer's continuing solvency is *not* a knowing and willing participant in the owner's fraud. Like an innocent minority shareholder whose interests in a corporation are harmed by a conspiracy of the other shareholders to loot the corporation for their own private gain, the public is an innocent stakeholder in the solvency of the insurer, with an important, legally protected interest in the company that is materially harmed whenever the sole owner loots the company. Through the Insurance Commissioner, the public can be counted on to take immediate action to preserve and protect its interest in the company's solvency if it ever receives word, from an auditor or otherwise, that those interests may be threatened by a self-dealing owner.

The Court therefore finds that the Liquidator's claims in the name of First Connecticut must not be stricken. The fraud of the Chains, as its sole owners and shareholders, was a fraud *upon* First Connecticut, not a fraud *by* it. The Chains' fraud is not imputable to First Connecticut because their interests were always adverse

to the public's enforceable interest in ensuring the insurer's continuing solvency. Because the Commissioner had the right and duty to take it over and manage its affairs on behalf of the public if its insolvency was threatened, the company itself has an enforceable claim against any person or entity who unlawfully contributed materially to its insolvency by violating a legal duty to advise it, either directly or through the Commissioner, as to its true financial status.

## III

## ANDERSEN'S CHALLENGE TO THE LIQUIDATOR'S RIGHT TO PURSUE CLAIMS ON BEHALF OF THE CREDITORS AND POLICYHOLDERS OF FIRST CONNECTICUT

Andersen's second general claim on its Motion to Strike is that the last six counts of the Liquidator's Revised Complaint must be stricken because the Liquidator cannot prevail on them "[a]s to First Connecticut" and has no standing to prosecute them "[a]s to . . . [the] Policyholders and Creditors" of First Connecticut.[7] To the extent that the claims were brought "[a]s to First Connecticut," Andersen argues that they must be stricken on the same legal basis as it moved to strike the first three counts. That argument, of course, must be rejected for the reasons previously stated in Part I of this opinion.

Because of that ruling, the Court need not reach and decide the defendant's alternative basis for its motion. See, e.g., *Doyle* v. *A & P Realty Corp.*, 36 Conn. Sup.

---

[7] The challenged claims, to reiterate, were all brought by the Liquidator "[a]s to First Connecticut, Its Policyholders and Creditors." The claims they present sound, respectively, in negligent misrepresentation (Fourth Count), recklessness (Fifth Count), intentional misrepresentation (Sixth Count), aiding and abetting breach of fiduciary duty (Seventh Count), aiding and abetting fraud (Eighth Count), and violation of General Statutes § 42-110g, the Connecticut Unfair Trade Practices Act ("CUTPA") (Ninth Count).

126, 414 A.2d 204 (1980) (motion to strike fails if any part of challenged pleading is legally viable). Even so, the Court will briefly address that claim for the guidance of the parties.

To the extent that the last six counts were brought "[a]s to . . . Policyholders and Creditors [of First Connecticut]," the defendant has moved to strike them on the ground that the Liquidator has no standing to bring them because each is an individual claim, belonging personally to one or more individual creditors or policyholders of First Connecticut. Thus, though it concedes that the Liquidator has the power to prosecute "common claims" on behalf of the creditors and policyholders of First Connecticut—claims that "would increase the assets of the liquidation estate against which the policyholders and creditors would recover[,]"—the defendant insists that the claims presented in the last six counts are "by their nature personal to each creditor . . . or each policyholder," and therefore, "can only be prosecuted by individual policyholders or creditors on their own behalf." Quoting *Cotten* v. *Republic National Bank of Dallas*, 395 S.W.2d 930, 941 (Tex. Civ. App. 1965), the defendant, in its Motion to Strike Plaintiff's Revised Complaint, contends that a " 'receiver may not . . . maintain a suit in his representative capacity for their joint benefit.' "

The Liquidator does not contend that he has the power to prosecute individual claims on behalf of individual creditors and policyholders against third parties. Thus he has no quarrel with the defendant's assertion, under *Hirsch* v. *Arthur Andersen & Co.*, 72 F.3d 1085, 1093 (2d Cir. 1995), that "when creditors . . . have a claim for injury that is particularized as to them, they are exclusively entitled to pursue that claim, and the bankruptcy trustee is precluded from doing so."

Instead, it takes issue with the defendant's characterization of his last six claims, contending that each is obviously a claim to recover damages for the estate of First Connecticut, to replenish its dangerously depleted assets for the common benefit of all persons, especially creditors and policyholders, who may one day have claims against it.

The Liquidator's authority to prosecute common claims for the estate of an insurer in liquidation, for the ultimate benefit of the insurer's policyholders and creditors, is undoubted. It arises generally under the Insurers Rehabilitation and Liquidation Act ("Act"), discussed in Part II of this opinion, and in particular under § 38a-923, which provides in part as follows: "(a) The liquidator shall have the power . . . (13) to prosecute any action which may exist on behalf of the creditors, members, policyholders or shareholders of the insurer against any officer of the insurer or any other person . . . [and] (19) to exercise and enforce all the rights, remedies, and powers of any creditor, to avoid any transfer or lien that may be given by the general law and that is not included with sections 38a-928 to 38a-930, inclusive.

"(b) The enumeration, in this section, of the powers and authority of the liquidator shall not be construed as a limitation upon him, nor shall it exclude in any manner his right to do other acts not specifically enumerated, or otherwise provided for, as may be necessary or appropriate for the accomplishment of or in aid of the purpose of liquidation."

Construed, as they must be, in light of their express statutory purpose—that is, to reiterate, "the protection of the interests of insureds, claimants, creditors and the public generally," as set forth in § 38a-903—these provisions clearly give the Liquidator the broadest possible mandate to recover monies for the estate, for the general benefit of creditors and policyholders.

The question presented on this challenge is thus whether or not the allegations of the last six counts make out claims for damages by individual creditors and/or policyholders, or claims by and on behalf of the insolvent insurer's estate for the common benefit of persons, such as policyholders and creditors, with potential claims against the estate itself. For the following reasons, the Court concludes that the Liquidator has asserted only proper common claims.

The essential factual basis for each of the Liquidator's claims "[a]s to [the] Policyholders and Creditors" of First Connecticut is the above-described set of allegations concerning the alleged failure by defendant Andersen to report the true financial status of First Connecticut to the State Insurance Department in First Connecticut's annual audited financial statements from 1992 through 1994. The harm that is claimed to have resulted from the defendant's alleged misconduct—its alleged misreporting of the worthless Capital Benefit receivable as an admitted asset at full value—was permitting the Chains to continue operating and looting First Connecticut long after it had become insolvent and should have been placed in receivership. So pleaded, the claim in question seeks damages from defendant Andersen *not* for individual claims by First Connecticut policyholders or creditors, but for wrongful conduct that allegedly diminished the insurer's insolvency estate. Thus, for example, the Liquidator does not allege that Andersen's misreporting harmed potential policyholders of First Connecticut by inducing them to buy insurance policies that had no sound financial backing. Similarly, the Liquidator does not contend that creditors were harmed directly by First Connecticut's false appearance of solvency, born of Andersen's misrepresentations. Such claims would be individual claims against defendant Andersen which individual policyholders and creditors would have to prosecute on their own.

Instead, the Liquidator claims that because of Andersen's misconduct, the Insurance Commissioner, as the representative of the public, including all past and future policyholders and First Connecticut itself, was induced to permit First Connecticut to remain in business, and thus to allow it to accumulate debt well in excess of its assets, while its sole shareholders, Robert and Helen Chain, continued to loot it for their own private purposes. In the Fourth and Sixth Counts of the Revised Complaint, which sound, respectively, in negligent and intentional misrepresentation, the Liquidator asserts that Andersen knew that its audited financial statements would be received and relied upon by the Insurance Commissioner. The Commissioner, in receiving and relying upon Andersen's audit report and the Andersen-audited financial statements, was acting on behalf of the public, including First Connecticut and its policyholders and creditors. Having been so misled, the Commissioner did not petition the Superior Court to place First Connecticut in rehabilitation or liquidation, though knowledge of First Connecticut's actual or threatened insolvency would have justified him in immediately pursuing either remedy for "the protection of . . . insureds, claimants, creditors and the public generally . . . ." General Statutes § 38a-903. If these allegations are true, the estate of First Connecticut suffered a substantial loss as a direct result of Andersen's misreporting.

The Liquidator's other challenged counts raise substantially similar claims of misconduct against defendant Andersen, though each, of course, alleges a different scienter and provides a somewhat different description of the reasons why Andersen's alleged misreporting of First Connecticut's financial status is claimed to be actionable. Importantly, however, each count is based on the same basic claims of causation and harm. Because that harm was allegedly suffered

by the estate of First Connecticut, causing a diminution of its assets to the common detriment of the public and all persons generally interested in the insurer's continuing solvency, those claims may properly be brought by the Liquidator to recover the lost monies for the estate.[8]

---

[8] The Court finds support for its foregoing conclusion in the opinions of courts in different jurisdictions which have been called upon to decide similar challenges to a liquidator's right to make claims against third parties on behalf of the estates of insolvent insurers. Though a detailed review of those decisions is not called for, since the claims there in question arose under different statutory schemes, the principal thrust of their analyses is very similar to that of this court. In *Arthur Andersen* v. *Superior Court*, 67 Cal. App. 4th 1481, 79 Cal. Rptr. 2d 879 (1998), for example, the California Court of Appeals determined that a State Insurance Commissioner, as Liquidator of an insolvent insurance company, Cal-American, had the right and power to sue the company's accountants for negligent misrepresentation on behalf of Cal-American's liquidation estate. "There is a significant distinction," the Court explained, "between pursuing a claim of negligent misrepresentation on behalf of the liquidation estate versus pursuing the idiosyncratic claims of numerous policyholders. . . . Some policyholders have insurance claims against Cal-American's estate. The Insurance Commissioner is simply assembling funds to pay those claims. Many policyholder claims have been converted into claims by the California Insurance Guaranty Association (CIGA), which paid claims that Cal-American's depleted estate was unable to pay. CIGA therefore now also has claims against Cal-American's liquidation estate. Although the Insurance Commissioner is suing for the benefit of policyholders and CIGA in the sense that he sues to recover for the liquidation estate, since funds in the liquidation estate will be used to pay policyholder and CIGA claims, it is clear that the Insurance Commissioner is not asserting, for example, the claim of any particular individual for a negligent misrepresentation made directly to that individual." (Citation omitted.) Id., 1497.

Similarly, in *Cordial* v. *Ernst & Young*, 199 W. Va. 119, 483 S.E.2d 248 (1996), where the receiver of a defunct insurer had brought suit against the defendant accounting firm which had been hired by the insurer to perform a statutory audit of the insurer for submission to the State Insurance Commissioner as required by State law, the Supreme Court of Appeals of West Virginia ruled that the receiver had standing to sue the accountant for fraud, negligent misrepresentation and breach of contract on behalf of the insurer's insolvency estate. In reaching this result, the *Cordial* Court determined that, in serving as receiver, the Commissioner or his agent is " 'a governmental official charged with authority to protect not only the shareholders of the corporation, but also policyholders, creditors and the public.' " Id., 128, quoting *Clark* v. *Milam*, 192 W. Va. 398, 404, 452 S.E.2d 714 (1994). Therefore,

IV

## ANDERSEN'S CHALLENGE TO THE LEGAL SUFFICIENCY OF THE LIQUIDATOR'S ALLEGATIONS OF CAUSATION AND RELIANCE IN COUNTS FOUR THROUGH NINE

The defendant next asserts that the last six counts of the Liquidator's Revised Complaint must be stricken for failure to allege a legally sufficient theory of causation or reliance. It flatly rejects the theory of causation and reliance discussed in Part III of this opinion.

Under that theory, the estate of First Connecticut was harmed by the defendant's misreporting of First Connecticut's true financial picture to the State Insurance Commissioner. The misreporting allegedly caused the Commissioner not to act immediately to place First Connecticut in receivership, which he would otherwise would have done to protect the interests of insureds, claimants, creditors and the public, had the truth been known. By misleading the Commissioner, claims the Liquidator, and inducing him to rely on its erroneous financial statements, the defendant constructively misled and harmed the persons whose vital interests the

it concluded that, "given the broad public interest in the sound administration of insurance firms, evidenced by the comprehensive scheme of insurance regulation found in [West Virginia's insurance statutes], it seems apparent that Ms. Cordial, as receiver, is carrying out a duty that runs to the public in pursuing the claims of 'policyholders, creditors, shareholders or the public', as mentioned in *Clark* v. *Milam*, supra [404]. Thus, we find that the Insurance Commissioner, while acting as receiver for an insurer, acts as the representative of interested parties, such as the defunct insurer, its policyholders, creditors, shareholders, and other affected members of the public, and any [person] appointed by the Commissioner for the purposes of carrying out his [statutory] duties as receiver . . . has standing, in their capacity as receiver, to bring an action such as this one to vindicate the rights of such interested parties." *Cordial* v. *Ernst & Young*, supra, 128.

Commissioner was sworn to protect. According to the defendant, such a claim for damages based on third-party reliance upon alleged misrepresentations is not actionable under Connecticut law.

The Court agrees with the defendant that if the Commissioner's only role in the operations of First Connecticut were as an independent third party, its present claim would have considerable merit. For all of the reasons expressed in Parts II and III of this opinion, however, that is simply not the case.

The Commissioner, to reiterate, plays a special statutory role in the operation of an insurance company, particularly with regard to preserving and maintaining the continuing solvency of the company. Not only does he oversee the operations of the insurer to protect that vital public interest, requiring, inter alia, the submission of annual audited financial reports for his review, but he has the authority and responsibility to intervene directly in the company's affairs, taking it over, if necessary, and acting in lieu of its board of directors, if any serious threat to its solvency ever comes to his attention.[9]

The Insurers Rehabilitation and Liquidation Act makes it very clear that in exercising these responsibilities, the Commissioner is acting to protect the interests of "insureds, claimants, creditors and the public . . . ." General Statutes § 38a-903. Therefore, when the Commissioner is misled by false reporting not to take action to protect the interests he is bound to protect, those for whose benefit he would otherwise have acted, have also, constructively, been misled, and, more importantly, their vital interest in the solvency of the insurer has been compromised. It takes no leap of logic or departure from law to recognize that misrepresenta-

---

[9] See generally Footnote 5, infra.

tions which mislead an agent acting within the scope of his duties to the detriment of his principal are fully actionable by the principal on its own behalf. Here, then, the Court is persuaded that the Liquidator's claims of harm to the estate of First Connecticut, to the general detriment of its policyholders and creditors, may properly be based on the defendant's alleged misleading of their statutory representative, the Insurance Commissioner, as to the true financial status of First Connecticut. Misrepresentations to him were in sum and in substance misrepresentations to them. Had the misrepresentations not been made, he would have acted in their common interest to shut down First Connecticut before it was further looted and dragged deeper into debt.[10] This aspect of the Motion to Strike is there-

[10] Other states that allow their Insurance Commissioners to present common claims against third parties on behalf of the liquidation estates of insolvent insurers routinely reject the defendant's present reliance argument as well. Their theory, at bottom, is very simple. When a third party, such as an accounting firm, wrongfully misleads the Commissioner not to take some necessary action to prevent the insolvency of an insurer, the interests that are compromised are obviously not his now, but those of the persons in whose interest he would have acted had the truth been known. If the insurer becomes insolvent because of the Commissioner's reliance upon the wrongdoer and resulting inaction, the persons harmed are those very same policyholders and creditors, whose right to be paid on their just debts and valid claims will be compromised by the diminution in assets of the insurer's estate. Logically, then, if the insurer becomes insolvent, the Commissioner, as Liquidator of its estate, must have the power to recover from the wrongdoer what was lost or taken from the estate as a result of its proven wrongdoing.

In *Arthur Andersen* v. *Superior Court*, 67 Cal. App. 4th 1481, 1503–1505, 79 Cal. Rptr. 2d 879 (1988), for example, the Court followed the lead of the Minnesota Supreme Court in *Bonhiver* v. *Graff*, 311 Minn. 111, 248 N.W.2d 291 (1976), where the Minnesota Insurance Commissioner, as liquidator of the estate of an insolvent insurer, was permitted to bring a claim against an accountant whose erroneous reports had led him not to halt an insolvent insurer's operations before it suffered even greater losses due to related party transactions. The *Bonhiver* Court had reasoned that the only party who could sensibly sue the wrongdoer in the circumstances presented was the liquidator of the insurer's insolvency estate, on behalf of the policyholders. The Commissioner himself had suffered no losses; instead, it was the policyholders, who had justifiably relied upon the Commissioner as their

fore denied.*

statutory agent, who had actually suffered losses as a predictable result of the defendant's wrongdoing.

Analogizing the situation before it to that in *Bonhiver*, the California Court of Appeals permitted the State Insurance Commissioner, as liquidator of the estate of Cal-American Insurance Company, to pursue a claim for damages on behalf of the estate against an accounting firm whose alleged wrongdoing had led the Commissioner, as the policyholders' representative, not to take necessary action to preserve the insolvent insurer's dwindling assets. *"Bonhiver,"* declared the Court, "is closely on point with the instant case. In *Bonhiver*, as here, the insurance commissioner was acting for the benefit of policyholders. In *Bonhiver*, as here, the insurance commissioner relied on misrepresentations made by the accountant to conclude that the insurance company was solvent and to allow the insurance company to continue in business. In *Bonhiver*, as here, the insurance company was actually insolvent at the time of the insurance commissioner's reliance. In *Bonhiver*, as here, the insolvency worsened after the insurance commissioner's reliance. On the authority of *Bonhiver*, the Insurance Commissioner here is entitled to an opportunity to prove his case, and was not subject to summary judgment or adjudication on the theory that the accountant owed him no duty." *Arthur Andersen* v. *Superior Court*, supra, 67 Cal. App. 4th 1505.

*For purposes of publication, the remainder of this opinion, in which the court addresses numerous additional challenges by the defendant to the separate counts of the plaintiff's revised complaint, has been omitted.