MICHAEL T. McRAITH, Director of the State of Illinois Division of Insurance, Solely in His Capacity as Statutory and Court-Affirmed Liquidator of Coronet Insurance Company, Crown Casualty Company and National Assurance Indemnity Company, Plaintiff-Appellee, v. BDO SEIDMAN, LLP, f/k/a BDO Seidman, Defendant-Appellant.—MICHAEL T. McRAITH, Director of the State of Illinois Division of Insurance, Solely in His Capacity as Statutory and Court-Affirmed Liquidator of Coronet Insurance Company, Crown Casualty Company and National Assurance Indemnity Company, Plaintiff-Appellant, v. BDO SEIDMAN, LLP, f/k/a BDO Seidman, Defendant-Appellee (BDO Seidman, LLP, Third-party Plaintiff; Clyde W. Engle, *et al.*, Third-party Defendants).

First District (3rd Division)  Nos. 1—06—1430, 1—07—0959 cons.

Modified opinion filed upon rehearing May 27, 2009.

Tabet, DiVito & Rothstein, LLC (Gino L. DiVito, Gary L. Prior, Reema Kapur and John J. Barber, of counsel), McDermott, Will & Emery, LLP (William P. Schuman and Benjamin J. Hanauer, of counsel), and Schuyler, Roche & Crisham, P.C. (Jean M. Prendergast, of counsel), all of Chicago, for appellant.

Robinson, Curley & Clayton, P.C., of Chicago (Alan F. Curley and Robert L. Margolis, of counsel), for appellee.

JUSTICE QUINN delivered the opinion of the court:

This consolidated appeal arises from: (1) the interlocutory appeal of a certified question pursuant to Supreme Court Rule 308 (155 Ill.

2d R. 308) regarding whether a private tolling agreement may indefinitely extend the statutory limitation period for refiling a claim under section 13—217 of the Code of Civil Procedure (Code) (735 ILCS 5/13—217 (West 2006)) and the five-year statute of repose for accountants pursuant to section 13—214.2(b) of the Code (735 ILCS 5/13—214.2(b) (West 2006)) (No. 1—06—1430); and (2) the decision of the circuit court of Cook County to dismiss counts I, II and III of a lawsuit commenced by plaintiff, Director of the State of Illinois Division of Insurance Michael T. McRaith, acting in his capacity as statutory and court-affirmed liquidator (the Liquidator) on behalf of the insolvent third-party insurance company claimants (No. 1—07—0959). The lawsuit alleged, *inter alia*, that defendant, BDO Seidman, LLP, formerly known as BDO Seidman (BDO), committed negligence and breach of contract in its public accounting and auditing services provided to the third-party insurance companies. In its order dismissing the Liquidator's lawsuit, the circuit court held that the "sole owner" doctrine barred the claims of the third-party insurance companies against BDO.

Pursuant to the supreme court's November 29, 2006, supervisory order, we decide whether the parties' private tolling agreement extended the statute of limitations for refiling a claim under section 13—217 and the five-year statute of repose for accountants pursuant to section 13—214.2(b). In addition, we determine whether the circuit court properly dismissed counts I, II and III of the Liquidator's lawsuit under Code section 2—619 (735 ILCS 5/2—619 (West 2006)).

For the following reasons, in appeal number 1—06—1430, we cannot answer the certified question as phrased, but we do hold that the parties' private tolling agreement effectively extended both sections 13—214.2(b) and 13—217 and, therefore, the Liquidator's claims against BDO are not time-barred. Further, in appeal number 1—07—0959, we reverse the circuit court's decision to dismiss counts I, II and III of the Liquidator's September 22, 2005, complaint against BDO and remand for further proceedings. We also find, as a matter of first impression, that the imputation doctrine does not apply to the director of the State of Illinois Division of Insurance (IDI) when acting as an insolvent insurance company liquidator under the statutory authority provided by the Illinois Insurance Code (215 ILCS 5/1 *et seq.* (West 2006)) and Civil Administrative Code of Illinois (20 ILCS 5/5—1 *et seq.* (West 2006)).

## I. BACKGROUND

### A. *Facts Relevant to Both Appeals*

Plaintiff is the director of the IDI and has appeared in this action in his statutory and court-affirmed capacity as liquidator of the third-

party insurance companies, Coronet Insurance Company (Coronet), Crown Casualty Company (Crown) and National Assurance Indemnity Company (National Assurance) (collectively, the Insurance Companies). Defendant is a national certified public accounting firm with offices in Chicago.

The Insurance Companies are Illinois-domiciled companies that principally sold automobile insurance to individuals. Crown and National Assurance were wholly owned subsidiaries of Coronet. During their years of operation, the Insurance Companies were regulated by the IDI. Each of the Insurance Companies was declared insolvent and ordered into liquidation by the circuit court beginning with Coronet on December 24, 1996, National Assurance on January 3, 1997, and Crown on January 31, 1997.

The parties do not dispute that, at all relevant times, the insurance companies were owned by corporate entities owned and controlled by third-party defendant, Clyde W. Engle. The parties also do not dispute that, at all relevant times, Engle dominated and controlled the insurance companies. In addition to being the ultimate owner of the Insurance Companies and third-party defendant corporations, Engle was chairman of the board of directors and chief executive officer for each of the insurance companies and third-party defendants RDIS Corporation, Telco Capital Corporation, Hickory Furniture Company, Indiana Financial Investors, Inc., Wisconsin Real Estate Investment Trust, Sunstates Corporation and Normandy Insurance Agency, Inc. In addition, Engle served as a director or trustee of the other third-party defendant corporations.

BDO audited the insurance companies pursuant to the Civil Administrative Code and issued audit reports on their financial statements for the years 1992, 1993 and 1994. BDO began work on the 1995 audits, but did not complete them or issue any statutory statement opinions for that year.

During the time period when BDO provided auditing services to the insurance companies, Illinois law required an annual audit of licensed insurers by a certified public accountant or an independent accounting firm. Specifically, Title 50, section 925, of the Administrative Code provided that "[a]nnual audited financial reports must be filed by all insurers[1] with the Director [of the Illinois Department of Insurance] on or before June 1, for the year ended December 31 immediately preceding." 50 Ill. Adm. Code §925.40 (1991). "[A]n

---

[1]The Administrative Code defines an insurer as "a domestic insurance company as defined in Section 2(f) of the Illinois Insurance Code (Ill. Rev. Stat. 1985, ch. 73, par. 614(f))." 50 Ill. Adm. Code §925.30 (1991).

independent certified public accountant or accounting firm who has a license to practice issued by the state in which he resides or has his principle place of business" was required to perform the annual audit. 50 Ill. Adm. Code §§925.30, 925.60(a) (1991). "The insurer shall obtain a letter from such accountant, and file a copy with the Director, stating that the accountant is aware of the provisions of the Illinois Insurance Code *** relat[ing] to accounting and financial matters and affirming that he will express his opinion on the financial statements in terms of their conformity to the statutory accounting practices prescribed or otherwise permitted by the Department [of Insurance] ***." 50 Ill. Adm. Code §925.60(b) (1991). The Administrative Code stated that "[t]he purpose of this Part is to improve the Illinois Insurance Department's surveillance of the financial condition of insurers by requiring an annual examination by independent certified public accountants of the financial statements reporting the financial condition and the results of operations of insurers." 50 Ill. Adm. Code §925.20 (1991).

The contents for the annual audited financial report included, *inter alia*: (1) the accountant's report; (2) a balance sheet reporting admitted assets, liabilities, capital and surplus; (3) a statement of operations or statement of revenues and expenses; (4) a statement of changes in financial position or cash flows; and (5) a statement of changes in capital and surplus. 50 Ill. Adm. Code §925.50(b) (1991). The Administrative Code provided that the accountant's examination of the insurer's financial statements "shall be conducted in accordance with generally accepted auditing standards." 50 Ill. Adm. Code §925.90 (1991). The director was not precluded from ordering, conducting or performing examinations of insurers under his jurisdiction, including the financial condition and operations of such insurers. 50 Ill. Adm. Code §925.20 (1991).

In addition, the Administrative Code provided requirements for notification of an adverse financial condition. "The insurer required to furnish the annual audited financial report shall require the independent certified public accountant to immediately notify in writing an officer or director of the insurer of any determination by that independent certified public accountant that the insurer has materially misstated its financial condition as reported to the Director as of the December 21 immediately preceding, or of any determination that the insurer does not meet the minimum capital and surplus requirement of the Illinois Insurance Code ***." 50 Ill. Adm. Code §925.100(a) (1991). Further, "[i]f the accountant, subsequent to the date of the audited financial report filed pursuant to this Part, becomes aware of facts which might have affected his report, the Department notes the

obligation of the accountant to take such action as prescribed by Volume 1, Section AU561 of the Professional Standards of the American Institute of Certified Public Accountants." 50 Ill. Adm. Code §925.100 (c) (1991).

### B. *Facts Relevant to Appeal No. 1—06—1430*

On July 25, 1997, the Liquidator's predecessor filed his initial complaint against BDO in the circuit court alleging, *inter alia*, professional malpractice as the Insurance Companies' statutory auditor (1997 BDO action).[2]

To pursue settlement negotiations and avoid the costs of litigation, the parties subsequently agreed to a dismissal of the 1997 BDO action without prejudice in exchange for the execution of a tolling agreement that would freeze the rights of the parties at that time. On February 27, 1998, the parties executed a tolling agreement (first tolling agreement) that provided the following in paragraph 1:

"BDO hereby agrees that the period (hereinafter referred to as the 'Tolling Period') commencing on July 26, 1997, and ending on June 30, 1998 shall be excluded from the calculation of any limitations or other time-related periods for purposes of any statute of limitations, doctrine of laches, or any other time-related defenses applicable to claims (a) asserted in the Action, or (b) arising out of the professional services provided by BDO to Coronet, [National Assurance] and/or Crown and their subsidiaries (collectively 'Claims')."

The first tolling agreement also stated:

"Within seven (7) days of the execution of this Agreement, [the Liquidator's predecessor] will voluntarily dismiss without prejudice the Action. In the event [the Liquidator's predecessor] causes an action to be filed based on any Claims, BDO agrees that (a) it will not seek to invoke the provisions of section 13—217 of the Illinois Code of Civil Procedure, 735 ILCS 5/13—217 ('Section 13—217'), in that action, (b) that it will not assert that the voluntary dismissal of [the Action] as described herein constitutes a dismissal as contemplated by Section 13—217, and (c) that it will not include the Tolling Period in the calculation of the period of time for purposes of asserting any time-related defenses."

Section 13—217 permits a plaintiff to refile a voluntarily dismissed lawsuit "within one year or within the remaining period of limitation, whichever is greater." 735 ILCS 5/13—217 (West 2006). Although the

---

[2]In our original opinion in this case, we asserted "The claims as set forth in the 1997 BDO action were timely under the pertinent statutes of limitation and repose." We agree with BDO's position in their petition for rehearing that the timeliness of the Liquidator's claims is still at issue on remand.

first tolling agreement did not specifically mention section 13— 214.2(b), the five-year accountant's statute of repose (735 ILCS 5/13— 214.2(b) (West 2006)), the parties expressly agreed to toll the period of time for asserting "any time-related defenses." Pursuant to the first tolling agreement, the 1997 BDO action was dismissed without prejudice on March 5, 1998.

Thereafter, over the next several years, BDO and the Liquidator agreed to 12 extensions of the first tolling agreement, the last of which was executed on June 26, 2000 (final tolling agreement). The first tolling agreement and the subsequent 11 supplemental agreements each contained a specific time duration. The twelfth and final tolling agreement, however, provides:

> "The period of time referred to in paragraph 1 of the original Tolling Agreement shall be extended to the period commencing on July 26, 1997, and ending on the date on which the Liquidator files in any federal or state court or other forum a complaint, amended complaint or other pleading or petition naming BDO as a party (the 'Termination Date'), so that this entire time period shall be excluded from the calculation of any limitations or other time-related period referred to in paragraph 1 of the original Tolling Agreement. No prior notice need be given by Liquidator to BDO of any filing referred to herein."

The final tolling agreement also states that "[n]othing in this or any other Tolling Agreement shall prevent BDO from raising any defenses (other than time-related defenses referred to in paragraph 1 of the original Tolling Agreement)," and that the terms of the first tolling agreement "shall remain in effect through and including the Termination Date, as defined above." In short, the Liquidator and BDO agreed "to renew, supplement and further extend the [first] Tolling Agreement and all Extensions and Supplemental Extensions thereto." Significantly, at the time BDO and the Liquidator executed the final tolling agreement, the Liquidator had a pending federal action against Engle (Engle federal action).

The Engle federal action was brought against Engle and a number of codefendants to recover property and damages due the insurance companies and to compensate them for losses caused by the alleged misconduct of their directors, attorneys and others. The Liquidator alleged that, over a period of 11 years beginning in 1985, "Engle, assisted by the other defendants, devised and implemented a series of complex financial transactions by which more than seventy million dollars was illegally transferred out of the insurance companies." The Liquidator claimed that "[t]he purpose of the illegal transactions was to remove cash and other assets from the insurance companies that

should have been used to pay policyholder claims, and to use the cash and assets so removed to support personal and business interests of Engle and the other defendants." The Liquidator asserted that, by the end of 1996, the insurance companies had been drained of all their assets and were no longer able to pay the claims of their policyholders. Engle then surrendered the insurance companies to the Liquidator for liquidation of their assets.

In the spring of 2000, the parties allegedly met to try to settle the dispute, but failed to reach an agreement. BDO suggested during the settlement discussions that the Liquidator await the outcome of the then-pending federal case against Engle before refiling the 1997 BDO action. The Liquidator allegedly agreed to wait until the resolution of the federal case before further addressing his claims against BDO. The Engle federal action settled at some point prior to August 11, 2005.[3] Thereafter, the Liquidator contacted BDO and the parties agreed to meet for further settlement negotiations on August 11, 2005. According to the Liquidator, the parties had reached an impasse, which led to the filing of a complaint against BDO on September 22, 2005 (2005 BDO action).

On October 31, 2005, BDO moved to dismiss the Liquidator's 2005 BDO action pursuant to Code section 2—615 (735 ILCS 5/2—615 (West 2006)), alleging that the case was barred by sections 13—217 and 13—214.2(b). BDO contended that the parties' tolling agreements did not extend the statute of repose because none of the agreements specifically referred to the statute of repose. BDO also asserted that neither the five-year statute of repose for accountants nor the refiling rule can be waived or tolled by the agreement of the parties. In addition, BDO argued that the Liquidator's claims were barred because the final tolling agreement violated public policy against stale claims and in favor of ending a litigation at some absolute, final and definite date.

On January 30, 2006, the circuit court ruled on BDO's motion to dismiss the 2005 BDO action. The court found that "the agreements' language (particularly the last agreement) clearly and unambiguously provides that [BDO] agrees to allow [the Liquidator] to refile his action without worry regarding the respective statutes of limitation and the statute of repose." The court denied BDO's motion because the final tolling agreement "clearly provided such a tolling" of the statutes of limitation and repose.

Next, on March 2, 2006, BDO moved to certify two questions for interlocutory appeal pursuant to Rule 308. Ultimately, the circuit court certified one of those questions to this court, namely:

---

[3]The record does not include the exact date of settlement of the Engle Federal action.

"May parties, through a tolling agreement, extend indefinitely the one-year refiling rule provided by section 13—217 of the Code of Civil Procedure (735 ILCS 5/13—217) and the accountant's five-year statute of repose provided by section 13—214.2(b) of the Code (735 ILCS 5/13—214.2(b))?"

On June 22, 2006, this court denied BDO's motion for leave to appeal pursuant to Rule 308. BDO then filed a petition for leave to appeal in the supreme court. On November 29, 2006, the supreme court denied BDO's petition, but issued a supervisory order to this court ordering that BDO's Rule 308 leave to appeal be decided on the merits. On February 6, 2007, this court vacated its order of June 22, 2006, and allowed BDO's Rule 308 petition. On June 5, 2008, this case was assigned to this panel. Oral arguments were held on June 25, 2008.

### C. *Facts Relevant to Appeal No. 1—07—0959*

BDO filed a second, combined motion to dismiss pursuant to Code section 2—619.1 (735 ILCS 5/2—619.1 (West 2006)). BDO asserted under section 2—615 of the Code (735 ILCS 5/2—615 (West 2006)) that the Liquidator's claims asserted on behalf of the Insurance Companies' creditors and insureds fail as a matter of law because the creditors and insurers lack standing to sue BDO under the Illinois Public Accounting Act (225 ILCS 450/0.01 *et seq.* (West 2006)). BDO also asserted that the Liquidator failed to state claims for negligence, breach of contract and violations of the Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.* (West 2006)). BDO's section 2—619 claims stated:

"The Liquidator's claims asserted on behalf of the insurance companies themselves are barred by the Liquidator's sworn allegations in the prior federal lawsuit of fraud and other intentionally tortious conduct by the owners, officers and directors of the insurance companies. The insurance companies, as intentional tortfeasors, cannot recover under the law from the auditor that they admit they deceived."

Further, BDO claimed that, because the Liquidator brought counts I, II and III of the 2005 BDO action pursuant to section 191 of the Insurance Code (215 ILCS 5/191 (West 2006)), the Liquidator was then vested with all the rights of action of the insurance companies. In other words, BDO argued that the alleged fraudulent and willful misconduct of Engle and the other officers and directors was imputed to the insurance companies and, in turn, was imputed to the Liquidator, which consequently, barred the Liquidator's claims against BDO because intentional tortfeasors cannot sue alleged co-wrongdoers. BDO also asserted that audit clients, such as the insurance companies in this case, cannot recover from a deceived auditor where the fraud

was pervasive and committed not only by the company's top management, but by the owners of the audit client who are alleged to have themselves orchestrated the fraud and interfered with the auditing process to the extent that the fraud was concealed from the auditor. BDO sought the dismissal of counts I, II and III from the Liquidator's 2005 BDO action.

In response to BDO's motion, the Liquidator argued Illinois law precludes imputation in accountant malpractice cases where the individuals were not acting for the benefit of the company. The Liquidator asserted that Engle and the other defendants were acting adversely to the Insurance Companies by stealing from them. The Liquidator contended that the defendants in the Engle federal action would not benefit from the 2005 BDO action.

BDO replied that the "sole owner" doctrine applies in this case. BDO argued that whether an adverse interest existed was irrelevant because the fraudulent or improper conduct was committed by the company's owner. BDO contends that, in this case, Engle was both an adverse agent and the sole representative of the principal insurance companies when he committed fraudulent misconduct and, therefore, the insurance companies are charged with Engle and the other defendants' knowledge.

The Liquidator was granted leave to file a surreply and argued that the sole-owner exception does not apply in looting cases or cases brought by insurance company receivers, and that there was an insufficient factual record on which to conclude Engle was the sole owner. The Liquidator asserted that the insurance companies were not complicit in the commission of fraudulent acts in a scheme to defraud third parties; rather, the insurance companies were the intended victims of the scheme.

The circuit court denied BDO's motion on the issue of standing. The court also denied BDO's motion on the issue of imputation, finding applicable the holding in *Holland v. Arthur Anderson & Co.*, 127 Ill. App. 3d 854 (1984). The *Holland* court found that the adverse-interest rule precluded imputation of fraudulent conduct to the company. The circuit court in this case found, "it is apparent that Engle's actions were not done on behalf of the corporation."

Thereafter, the circuit court judge who denied BDO's section 2—619.1 motion to dismiss retired from the bench. The case was reassigned to a different circuit court judge, who reviewed BDO's December 22, 2006, motion to certify question for interlocutory appeal. The court entered an order converting BDO's Rule 308 motion to a motion to reconsider the denial of BDO's section 2—619.1 motion to dismiss.

After reviewing additional briefs from each party, the circuit court conducted a hearing on BDO's motion. Following argument by both parties, the court granted BDO's motion to reconsider and dismissed counts I, II and III of the 2005 BDO action in their entirety, with prejudice. The court stated its reasoning as follows:

"While I did not find any cases also in Illinois regarding the Sole Owner Doctrine *** [a]nd now that the Commissioner of Insurance or Director of Insurance is now standing in the shoes of Mr. Engle or the company since it's a sole owner, the Motion To Reconsider is going to be granted. The Motion To Dismiss is going to be granted, also, based on the Sole Owner Doctrine."

On April 6, 2007, the Liquidator timely appealed.

## II. ANALYSIS

In appeal number 1—06—1430, BDO argues that the final tolling agreement in this case cannot indefinitely extend the limitation period for the refiling rule under Code section 13—217 or the accountant's five-year statute of repose pursuant to section 13—214.2(b) of the Code. BDO contends that a private, indefinite tolling agreement is violative of Illinois law and public policy. BDO asserts that Illinois courts strictly construe statutes of limitation and repose and that public policy strongly favors imposing a reasonable closure on a plaintiff's claims for the benefit of everyone involved in the administration of justice.

The Liquidator responds that BDO is a sophisticated national accounting firm with experienced attorneys that were fully aware of the consequences surrounding the agreement to toll and expressly forfeit all time-related defenses, including sections 13—214.2(b) and 13—217, in exchange for the Liquidator's dismissal of the timely 1997 BDO action. The Liquidator asserts that, due to the inherently uncertain length of the Engle federal action, the parties needed flexible language to end the inefficient practice of executing short extensions every few months as had been done for the first 11 tolling agreements. The Liquidator contends that, as a result, the parties agreed to the final tolling agreement which BDO now challenges. The Liquidator maintains that, if BDO truly had been concerned about any potential abuse of the tolling of the statutes of limitation and repose, it could have refused to sign any of the extensions. The Liquidator asserts that BDO engaged in the negotiation process and, after having obtained the benefits of that process, namely, the dismissal of the 1997 BDO action, the Liquidator's continued forbearance of suit against BDO, and the possibility of avoiding litigation altogether, BDO now seeks to void the parties' final tolling agreement because it no longer suits BDO's purpose. The Liquidator argues that no law or public policy should

prevent sophisticated parties with equal bargaining power from contracting as the Liquidator and BDO have done here with the cost-saving goal of avoiding litigation, only to later negate the agreement after one party has reaped its benefits.

In appeal number 1—07—0959, the Liquidator argues that the circuit court erred by dismissing under Code section 2—619 counts I, II and III of the 2005 BDO action. The Liquidator asserts it is a violation of well-settled law to (1) impute the conduct of a thief, in this case, Engle, to his victims, here, the insurance companies; (2) then impute that conduct to the Liquidator, whose duty as imposed by the Illinois Insurance Code is to liquidate immediately the property, business and affairs of the company to preserve the rights and interests of policyholders and other creditors; and (3) apply the *in pari delicto* defense against the Liquidator. The Liquidator maintains the equitable imputation doctrine does not apply where, as here, (1) the wrongdoers acted adversely to the insurance companies by stealing from them; (2) the plaintiff is an insurance company liquidator who has committed no wrongdoing and is suing for the ultimate benefit of innocent policyholders and creditors; (3) the wrongdoers have been removed and will not benefit from any recoveries in this lawsuit; and (4) imputation will not protect any innocent parties, but instead will serve only to spare negligent auditors from the liability they would otherwise face.

BDO responds that, because the Liquidator brought the claims at issue "solely on behalf" of the Insurance Companies, the Liquidator then stands in the shoes of those companies and is subject to all defenses that could be asserted against them by BDO. BDO asserts that the Liquidator judicially admitted that Engle was the ultimate owner and controlling person of the Insurance Companies and that the alleged fraud that BDO failed to detect was committed at the direction of Engle. BDO argues that for this reason, the sole-owner doctrine bars the claims of a plaintiff standing in the shoes of the company. BDO maintains that there is no meaningful distinction between the insurance industry and any other industry when applying the sole-owner doctrine. BDO contends that the equities are in its favor because it is accused of mere negligence, while the Liquidator is standing in the shoes of an intentional tortfeasor and, therefore, unable to sue BDO under well-established law.

## A. *Appeal No. 1—06—1430*

In this appeal, BDO argues that parties may not indefinitely toll the statutory time limitations at issue here for several reasons. BDO first asserts that indefinite tolling of the accountant's statute of repose

and the refiling rule is contrary to the plain language of these statutes. Next, BDO contends that indefinite tolling is contrary to Illinois law, which strictly construes time limitations and maintains a firm distinction between statutes of limitations and statutes of repose. Third, BDO argues that, while there is no Illinois authority on this issue, other jurisdictions overwhelmingly have held that statutes of repose and refiling statutes cannot be tolled indefinitely. Finally, BDO maintains that tolling by private agreement for an indefinite or unreasonable time subverts the legislative purpose and public policy behind statutes of limitation and repose.

The Liquidator responds that courts applying Illinois law and the laws of other states enforce agreements by parties to toll repose periods without regard to duration. The Liquidator asserts that statutes of repose are forfeitable affirmative defenses. The Liquidator points out a number of Illinois equitable estoppel cases, including *DeLuna v. Burciaga*, 223 Ill. 2d 49 (2006), where the supreme court enforced indefinite tolling of the statutes of limitation and repose without concern for statutory time limits for the underlying professional negligence claim. The Liquidator also contends that public policy strongly supports the final tolling agreement at issue here. In addition, the Liquidator argues that, having accepted the benefits of the tolling agreements, BDO cannot now assert that they are unenforceable.

### 1. Standard of Review

The certified question to be determined in this case involves the interpretation of Code sections 13—214.2(b) and 13—217. Because this issue involves both statutory and contract interpretation and there is no question of fact, we review this issue *de novo. Murray v. Chicago Youth Center*, 224 Ill. 2d 213, 228 (2007); *Mermelstein v. Menora*, 372 Ill. App. 3d 407, 411 (2007). The primary objective of the reviewing court when construing the meaning of a statute is to ascertain and give effect to the intent of the legislature. *Southern Illinoisan v. Illinois Department of Public Health*, 218 Ill. 2d 390, 415 (2006). The intent of the legislature "is best gleaned from the words of the statute itself, and where the statutory language is clear and unambiguous, it must be given effect." *Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 8 (2007).

Similarly, "[t]he primary goal of contract interpretation is to give effect to the parties' intent by interpreting the contract as a whole and applying the plain and ordinary meaning to unambiguous terms." *Joyce v. DLA Piper Rudnick Gray Cary LLP*, 382 Ill. App. 3d 632, 636-37 (2008). Contractual language is not rendered ambiguous simply

because the parties disagree. *Joyce*, 382 Ill. App. 3d at 637. Significantly, "a contract modified by the parties creates a 'new single contract consisting of so many of the terms of the prior contract as the parties have not agreed to change, in addition to the new terms on which they have agreed.' " *Joyce*, 382 Ill. App. 3d at 637, quoting *Schwinder v. Austin Bank of Chicago*, 348 Ill. App. 3d 461, 469 (2004).

### 2. Tolling of Section 13—214.2(b)

■ Section 13—214.2(b), the statute of repose for professional negligence actions against public accountants, provides:

> "In no event shall such action be brought more than 5 years after the date on which occurred the act or omission alleged in such action to have been the cause of injury to the person bringing such action against a public accountant." 735 ILCS 5/13—214.2(b) (West 2006).

BDO focuses particularly on the portion of the statute providing, "[i]n no event," arguing that indefinite tolling of section 13—214.2(b) would render that phrase meaningless. BDO cites cases holding that the phrase "in no event" is mandatory, particularly when coupled with the word "shall," as here. BDO relies upon *Kurr v. Town of Cicero*, 235 Ill. App. 3d 528 (1992), *Lincoln Manor, Inc. v. Department of Public Health*, 358 Ill. App. 3d 1116 (2005), *Short v. Belleville Shoe Manufacturing Co.*, 908 F.2d 1385 (7th Cir. 1990), and *Wilson v. Hill*, 782 P.2d 874 (Colo. App. 1989), in support of its argument. A review of these cases shows, however, that only *Short* involves a statute of repose. There, the Seventh Circuit Court of Appeals held that the plaintiff's action for securities fraud was untimely under the applicable statute of repose. *Short*, 908 F.2d at 1392-93.

The pertinent Illinois statutes and authority, however, do not support an interpretation of the "in no event" language as mandatory. Although the language, "[i]n no event," is plain and unambiguous, the statutes of repose for professional negligence in Illinois, including section 13—214.2(b), provide exceptions to this language. Within section 13—214.2(b) is an exception that reads, "in the event that an income tax assessment is made or criminal prosecution is brought against a person, that person may bring an action against the public accountant who prepared the tax return within two years from the date of the assessment or conclusion of the prosecution." 735 ILCS 5/13—214.2(b) (West 2006). Section 13—214.2(c) tolls the statute of repose in accounting malpractice cases until the plaintiff reaches the age of majority. 735 ILCS 5/13—214.2(c) (West 2006); see also 735 ILCS 5/13—212(c), 13—214.3(e) (West 2006). Section 13—215 of the Code of Civil Procedure provides tolling in professional negligence cases where "a person liable to an action fraudulently conceals the

cause of such action from the knowledge of the person entitled thereto." 735 ILCS 5/13—215 (West 2006); see also *DeLuna*, 223 Ill. 2d at 78-79; *Witherell v. Weimer*, 85 Ill. 2d 146, 159 (1981).

Accordingly, our legislature intended to grant certain exceptions to the statutes of repose as evidenced by the enactment of these statutes. Thus, the "[i]n no event" language that BDO refers to in section 13—214.2(b) does not require 100% enforcement of the statutes of repose in professional negligence cases. See *DeLuna*, 223 Ill. 2d at 72.

Furthermore, Illinois courts also have allowed the tolling of statutes of repose in professional negligence actions in other circumstances specific to the case. For example, the statute of repose for medical malpractice (735 ILCS 5/13—212 (West 2006)) may be tolled by a plaintiff based on a continuing negligent course of treatment for a specific condition. See *Cunningham v. Huffman*, 154 Ill. 2d 398, 404-06 (1993); but *cf. Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 347 (2002) (noting that the *Cunningham* decision did not adopt a continuing violation rule of general applicability in all tort cases).

The key consideration for tolling of the statutes of repose depends on whether there is a reasonable duration of tolling time that brings the repose period to an eventual end. In *Anderson v. Wagner*, 79 Ill. 2d 295, 311 (1979), the supreme court addressed the legislature's response to judicial expansion of the discovery rule, which had undermined the medical malpractice statute of limitations by creating a tolling provision of potentially unlimited duration. The court held that the then-four-year medical malpractice statute of repose provided due process to a potential plaintiff:

> " 'Any statute of limitations will eventually operate to bar a remedy and the time within which a claim should be asserted is a matter of public policy, the determination of which lies almost exclusively in the legislative domain, and the decision of the General Assembly in that regard will not be interfered with by the courts in the absence of palpable error in the exercise of the legislative judgment.' " *Anderson*, 79 Ill. 2d at 311, quoting *Owen v. Wilson*, 260 Ark. 21, 24-25, 537 S.W.2d 543, 545 (1976).

The supreme court in *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 401 (1997), stated:

> "Under the discovery rule, a cause of action accrued when a person learned of his injury or reasonably should have learned of it. Because the discovery rule came to be applied extensively in medical malpractice cases, statutes of limitation in existence no longer provided repose for malpractice defendants. The discovery rule was perceived to be partly responsible for the medical malpractice crisis

because it created a 'long tail' of liability for medical malpractice defendants. Thus, the statute of limitations provision at issue in *Anderson* was enacted to place an outside limit on the applicability of the discovery rule to physicians and hospitals."

In sum, the foregoing demonstrates that professional negligence statutes of repose, such as section 13—214.2(b), may be tolled, whether by statute or specific circumstance, as long as the action is not tolled indefinitely.

### 3. Tolling of Section 13—217

Section 13—217 provides that a party "may commence a new action within one year or within the remaining period of limitation, whichever is greater." 735 ILCS 5/13—217 (West 2006). BDO maintains that section 13—217 strictly requires the refiling of a claim within one year of dismissal. BDO also argues that the refiling rule is jurisdictional and cannot be waived, citing *Wilson v. Evanston Hospital*, 276 Ill. App. 3d 885 (1995), and *Johnson v. United National Industries, Inc.*, 126 Ill. App. 3d 181 (1984). We disagree.

"Section 13—217 provides plaintiffs with the absolute right to refile their complaint within one year or the remaining period of limitations, whichever is greater." *Timberlake v. Illini Hospital*, 175 Ill. 2d 159, 163 (1997). Section 13—217 should not be used as a mechanism for "harassing renewal of litigation." *Wilson*, 276 Ill. App. 3d at 888.

Here, BDO's reliance upon *Wilson* and *Johnson* for the proposition that section 13—217 is jurisdictional is misplaced. Statutes of limitation that apply to common law claims are considered procedural, not jurisdictional, and affect only the remedy available, not the substantive rights of the parties. *Lease Partners Corp. v. R&J Pharmacies, Inc.*, 329 Ill. App. 3d 69, 75 (2002). In addition, jurisdictional prerequisites for maintaining suit are expressly provided in Illinois statutes. See, *e.g.*, *Whitaker v. Human Rights Comm'n*, 184 Ill. App. 3d 356, 359 (1989) (noting that under section 7A—102(A)(1) of the Illinois Human Rights Act (775 ILCS 7A—102(a)(1) (West 2006)), the 180-day period to file a claim is a prerequisite for maintaining suit). The court in *Wilson* merely analogized section 13—217 to Supreme Court Rule 303 (134 Ill. 2d R. 303) for the purpose of determining at what point the statutory time begins to run. The *Wilson* court made no finding that section 13—217 is jurisdictional. Likewise, *Johnson* does not apply here because it does not involve tolling or waiver of the statute. Accordingly, BDO's argument on this issue is rejected.

In addition, BDO relies upon *Hinkle v. Henderson*, 85 F.3d 298 (7th Cir. 1996), to argue that the absolute outer limit for refiling under section 13—217 is one year after the expiration of either the statute of limitations or statute of repose. Essentially, the *Hinkle* court

determined whether section 13—217 applied both to statutes of limitation and repose. There, the plaintiff waited until the very last day of the eight-year repose period to file suit, then took no action in the circuit court for eight months, failing even to attempt service on the defendant, received a voluntary dismissal, and finally waited just short of one year to refile the case in district court. The defendant was served more than nine years after the alleged acts of negligence. The *Hinkle* court held that section 13—217 applies to the statute of repose. In its reasoning, the court stated:

"While 'saving' a cause of action for one year does not effect [*sic*] the indefiniteness of potential liability, it does change the certainty and predictability afforded defendants; however, this is true *only where the defendant is unaware that the first action was filed.* Where the defendant knows that plaintiff has brought an action, usually from receiving service, he must be presumed to understand that a procedural defect in the action may cause a delay of up to one year pursuant to the savings statute." (Emphasis in original.) *Hinkle*, 85 F.3d at 303.

The holding in *Hinkle* does not limit the period of refiling to one year as argued by BDO. Instead, *Hinkle* stands for the proposition that a refiled lawsuit that is timely under section 13—217 will not be barred by the statute of repose even though the refiling occurred beyond the repose period. 85 F.3d at 302-03. Moreover, unlike *Hinkle*, BDO was aware of the first action that was filed and entered into an express agreement with the Liquidator, which did not affect the certainty or predictability of refiling under section 13—217.

■ Our supreme court has held that section 13—217 is remedial in nature and, as a result, should be liberally construed. *Bryson v. News America Publications, Inc.*, 174 Ill. 2d 77, 106 (1996). In *Bryson*, as here, the original claim was timely filed within the statutory limitations period. Section 13—217 was enacted "to facilitate the disposition of litigation upon the merits and to protect plaintiffs from losing a cause of action because of a technical default unrelated to the merits." *Bryson*, 174 Ill. 2d at 106-07. The court held, where the initial action was timely filed, the plaintiff should not be penalized simply for exercising his absolute right to refile under section 13—217. *Bryson*, 174 Ill. 2d at 107.

In this case, a liberal construction of section 13—217 shows no intent by the legislature to prevent parties from tolling the statute. This interpretation is consistent with *Bryson* and, as will be shown, preserves the substantive rights of the parties based on the unique circumstances in this case. As we have determined the tolling of sections 13—214.2(b) and 13—217 is consistent with the intent of the

legislature and pertinent Illinois authority, we now turn to the issue of whether the final tolling agreement was valid.

### 4. Validity of the Final Tolling Agreement

This court recently determined whether an amended, private tolling agreement effectively tolled the statute of limitations for a legal malpractice action. See *Joyce*, 382 Ill. App. 3d at 637-38. In *Joyce*, the plaintiff, on behalf of similarly situated stockholders, sued the defendant law firm due to an alleged drafting error in a merger agreement. The plaintiff offered to withhold the defendant's name from their forthcoming suit against a codefendant if the defendant agreed to enter into a tolling agreement with respect to the statute of limitations. The parties agreed:

" '1. The running of any statute of limitations applicable to any of the Potential Claims, whether arising under state or federal law, including any defense based upon the doctrine of laches or any similar defense based upon the lapse of time (collectively, the "Statute of Limitations Defenses") is hereby tolled until such time as a lawsuit asserting any one or more of the Potential Claims against [defendant] is filed so long as such lawsuit is filed on behalf of one or more of the Potential Claimants, on or before December 31, 2002, and the Shareholder Representative delivers written notice to the undersigned representative of [defendant] of the filing of such lawsuit within three (3) business days after it is filed;

2. Without limiting the generality of any of the foregoing, [defendant] hereby waive[s] and agree[s] not to assert or attempt to avail [itself] of any Statute of Limitations Defenses based in whole or in part upon the passage of time occurring after the date of this Agreement in response to any lawsuit asserting any of the Potential Claims, provided such lawsuit is filed on behalf of one or more of the Potential Claimants, on or before December 31, 2002, and the Shareholder Representative delivers written notice to the undersigned representative of [defendant] of the filing of such lawsuit within three (3) business days after it is filed;

3. Except to the extent provided herein, this Agreement is without prejudice to the respective rights, claims and defenses of the parties hereto; and notwithstanding anything to the contrary contained herein, it is specifically understood and agreed that any Statute of Limitations Defense or Defenses which [defendant] may have as of the date of this Agreement is preserved, and shall not be affected in any manner whatsoever by this Agreement, and may be asserted by [defendant] in response to or against any one or more of the Potential Claims[.]' " *Joyce*, 382 Ill. App. 3d at 633-34.

The parties' tolling agreement was amended four times, altering only the date on which the plaintiff was required to file suit against

the defendant. As such, only the first two paragraphs of the tolling agreement were affected. In addition, the final amendment provided that " '[i]n all other respects, the Tolling Agreement, the First Amendment, the Second Amendment, the Third Amendment and the Fourth Amendment shall remain in full force and effect.' " *Joyce*, 382 Ill. App. 3d at 635.

The plaintiff filed the underlying legal malpractice claim nearly one year after the expiration of the tolling agreement. The defendant moved to dismiss the plaintiff's claim as untimely, but the circuit court denied the motion, finding that the plaintiff's claim was timely based upon the tolling agreement. The court also denied the defendant's motion to reconsider.

On appeal, the defendant argued that, because the plaintiff had failed to satisfy the condition precedent in the tolling agreement, namely, that the plaintiff was required to file the lawsuit by the stipulated date, the statutes of limitation and repose were not tolled, which barred the filing of the complaint. The plaintiff responded that each amendment renewed the starting date for the statute of limitations. This court disagreed.

In *Joyce*, this court found that the clear, unequivocal language from the first two paragraphs of the tolling agreement demonstrated that the defendant agreed to waive its potential timeliness defenses, but only if the plaintiff complied with the condition precedent to file the complaint by the agreed date. The court held that, because the plaintiff failed to comply with the condition precedent, the defendant's potential time-related defenses were not waived. *Joyce*, 382 Ill. App. 3d at 637. In addition, the court noted that its decision was further supported by paragraph three of the tolling agreement, which expressly preserved the defendant's timeliness defenses if the plaintiff failed to file his complaint by the agreed date. *Joyce*, 382 Ill. App. 3d at 637-38. Finally, the court stated, "to accept plaintiff's argument would require this court to allow plaintiff the benefits of the first four amendments without fulfilling the requirement of filing suit by the specified dates imposed by any of the amendments." *Joyce*, 382 Ill. App. 3d at 638.

For the purposes of the instant case, the *Joyce* court made no finding regarding whether a private tolling agreement requires a definitive duration of time in order to be enforceable. The holding in *Joyce* was limited to the issue of whether the tolling agreement barred the plaintiff from filing a complaint against the defendant.

"Individuals generally may waive substantive rules of law, statutory rights, and even constitutional rights enacted for their benefit [citation], so long as the waiver is knowing, voluntary, and inten-

tional." *In re Estate of Ferguson*, 313 Ill. App. 3d 931, 937 (2000). A statute creating a right unknown at common law with an inherent element in the right so created is not considered a statute of limitations. *Van Milligen v. Department of Employment Security*, 373 Ill. App. 3d 532, 542 (2007). Instead, a statute of limitations is an affirmative defense, which may be forfeited if not timely raised by the defendant. *Fox v. Heimann*, 375 Ill. App. 3d 35, 45 (2007); *Lease Partners*, 329 Ill. App. 3d at 76. Similarly, statutes of repose are affirmative defenses subject to forfeiture. *Willett v. Cessna Aircraft Co.*, 366 Ill. App. 3d 360, 371 (2006); *Boldini v. Owens Corning*, 318 Ill. App. 3d 1167, 1170 (2001).

In this case, BDO knowingly and voluntarily entered into each of the 12 tolling agreements with the Liquidator fully aware of the consequences of expressly forfeiting all time-related defenses. The record does not support BDO's assertions that the tolling agreements were one-sided in favor of the Liquidator. Both parties to the tolling agreements sought a benefit. The Liquidator contracted to avoid potential costly litigation, while BDO's 1997 action was dismissed with the possibility of avoiding litigation altogether depending on the outcome of the Engle federal action. The Liquidator sought damages from Engle and the other defendants for the purpose of making the policyholders and creditors whole. If the Engle federal action did not serve to make those parties whole, the Liquidator would seek the remainder from BDO for its alleged wrongful conduct.

There is no Illinois authority with similar factual circumstances; however, the decision in *First Interstate Bank of Denver v. Central Bank & Trust Co. of Denver*, 937 P.2d 855 (Colo. App. 1996), provides insight on this issue. There, the plaintiff initially sued the defendant under federal securities law, but did not join any state law claims. The federal district court granted the defendant's motion for summary judgment. While the appeal to the Tenth Circuit Court of Appeals was pending, the parties agreed in writing to toll any statute of limitations, doctrine of *laches* or other time bar on the plaintiff's state claims until a final adjudication on the federal claims. After a final determination by the United States Supreme Court, the plaintiff brought an action against the defendant for violations of Colorado securities law. On appeal, the plaintiff argued that the circuit court erred by finding the tolling agreement did not waive the time limit imposed by the Colorado Securities Act's statute of repose.

First, the Colorado Court of Appeals held that a stipulated, express forfeiture can negate a statute of repose. *First Interstate Bank*, 937 P.2d at 860. The court noted "although the introductory phrase 'in no event' may be read in particular contexts to establish a jurisdictional

condition [citation], it does not necessarily do so" for the pertinent statute of repose. *First Interstate Bank,* 937 P.2d at 861. The court next considered public policy and legislative intent for the terms of the statute, stating that "[t]he policy arguments advanced [by the defendant] simply are inapplicable when, as here, parties expressly agree not to assert the statute's time limitations." *First Interstate Bank,* 937 P.2d at 863. Pertinent for this case, the court found:

> "Specifically, here, there is no contention that the tolling agreement prompted plaintiff to delay investigation or wait for more favorable securities prices in order to bring suit, or that additional problems of proof developed. [Citations.] Indeed, when the tolling agreement was signed in July 1990, the claims were clearly defined and a similar action based on the same transaction had already been filed in federal district court and dismissed on summary judgment. Furthermore, the agreement, which made clear plaintiff's intention to assert additional claims in state court, was for the benefit of both parties, implemented to preclude unnecessary litigation while the federal issues were on appeal." *First Interstate Bank,* 937 P.2d at 863.

The circuit court's decision to dismiss the plaintiff's claims was reversed.

■ In this case, because the Liquidator's predecessor had filed his initial action against BDO in 1997, the claims asserted against BDO were clearly defined. As in *First Interstate Bank,* the Liquidator had filed another action based on the same transaction in federal court. None of the tolling agreements in this case made reference to the pending Engle federal action, but the record supports that the parties entered into the final tolling agreement and worded it as such based on the pending action in federal court. Otherwise, the "Termination Date" as provided in the final tolling agreement would have included a specific expiration date similar to the previous 11 tolling agreements, rather than "ending on the date on which the Liquidator files in any federal or state court or other forum a complaint, amended complaint or other pleading or petition naming BDO as a party."

The clear, unequivocal language of each of the tolling agreements demonstrates that BDO agreed to forfeit its potential timeliness defenses without exception or condition precedent, in contrast to *Joyce.* This conclusion is further supported because each of the tolling agreements repeated BDO's agreement to forfeit all time-related defenses and provided that the parties agreed "to renew, supplement and further extend the [first] Tolling Agreement and all Extensions and Supplemental Extensions thereto."

Moreover, we find that the final tolling agreement contemplates an eventual ending that is reasonable based on the facts specific to this case. We read a reasonableness requirement into the final tolling agreement. The record supports that the parties bargained for and agreed to the final tolling agreement based on the fact that the Engle federal action would come to an end. We do not hold here that private tolling agreements may forfeit time-related defenses indefinitely.

Based on the foregoing, our answer to the certified question cannot be answered in the affirmative or the negative. We hold that the private tolling agreements in this case were valid and effectively tolled all time-related defenses, including sections 13—214.2(b) and 13—217 of the Code of Civil Procedure. Therefore, we find that the Liquidator's claims against BDO are not time-barred.

### B. *Appeal No. 1—07—0959*

In this appeal, the Liquidator argues the circuit court erred by granting BDO's motion to dismiss counts I, II and III of the 2005 BDO action. According to the Liquidator, the fundamental principles of the imputation doctrine preclude the imputation of Engle's misconduct to the Liquidator. The Liquidator asserts that courts uniformly reject imputation defenses when asserted against liquidators of insolvent insurance policies, as supported by public policy. The Liquidator also contends that the sole-owner exception to the adverse-interest rule does not apply in this case. In addition, the Liquidator argues that, even if Engle's conduct could be imputed to the Insurance Companies, the equitable *in pari delicto* defense does not apply here.

BDO responds that the Liquidator's claims are barred by the doctrines of imputation and *in pari delicto* under the sole-owner doctrine. BDO asserts that the sole-owner doctrine applies when the fraudulent owner diverts insurance company funds. BDO maintains that there is no basis to apply different rules for *in pari delicto* or imputation in the case of insolvent insurance companies. BDO also argues that the Liquidator's claims are brought solely on behalf of the Insurance Companies, not their creditors and policyholders. Additionally, BDO asserts that the equities are in its favor and that the Liquidator is judicially estopped from contradicting its sole owner allegations.

### 1. Standard of Review

A section 2—619 motion to dismiss (735 ILCS 5/2—619 (West 2006)) raises defects or defenses to the complaint and questions whether the defendant is entitled to judgment as a matter of law. *Gonnella Baking Co. v. Clara's Pasta Di Casa, Ltd.*, 337 Ill. App. 3d 385, 388 (2003). "When reviewing a motion to dismiss, this court must accept all well-pleaded facts as true [citation] and view them in the light

most favorable to the plaintiff." *Gonnella Baking Co.*, 337 Ill. App. 3d at 388. We may consider all facts presented in the pleadings, affidavits, and depositions found in the record. *Gonnella Baking Co.*, 337 Ill. App. 3d at 388. Since the resolution of this case hinges on a matter of law, our review is *de novo*. *Gonnella Baking Co.*, 337 Ill. App. 3d at 388.

### 2. Public Policy for the Insurance Industry

The United States Supreme Court previously has noted the importance of the insurance industry to the public interest that remains quite relevant in today's economy:

> "We have shown that the business of insurance has very [defined] characteristics, with a reach of influence and consequence beyond and different from that of the ordinary businesses of the commercial world, to pursue which a greater liberty may be asserted. The transactions of the latter are independent and individual, terminating in their effect with the instances. The contracts of insurance may be said to be interdependent. They cannot be regarded singly, or isolatedly, and the effect of their relation is to create a fund of assurance and credit, the companies becoming the depositories of the money of the insured, possessing great power thereby, and charged with great responsibility. How necessary their solvency is, is manifest. On the other hand to the insured, insurance is an asset, a basis of credit. It is practically a necessity to business activity and enterprise. It is, therefore, essentially different from ordinary commercial transactions, and, as we have seen, according to the sense of the world from the earliest times— certainly the sense of the modern world—is of the greatest public concern." *German Alliance Insurance Co. v. Lewis*, 233 U.S. 389, 414-15, 58 L. Ed. 1011, 1023, 34 S. Ct. 612, 620 (1914).

Concomitant with federal regulation of the insurance industry, insurance companies also are subject to state control in the exercise of its police powers through the Insurance Code. *Lincoln Towers Insurance Agency, Inc. v. Boozell*, 291 Ill. App. 3d 965, 969 (1997). "Illinois has adopted a strong policy of regulating, controlling, and supervising the business of insurance because it affects the public interest." *Coronet Insurance Co. v. Washburn*, 201 Ill. App. 3d 633, 637-38 (1990). Illinois recognizes that the core aim of insurance regulation is "geared toward protecting policyholders from unscrupulous or inexperienced management." *Hoylake Investments Ltd. v. Washburn*, 723 F. Supp. 42, 46 (N.D. Ill. 1989).

For the purpose of protecting policyholders and creditors, the Illinois legislature enacted the Insurance Code, which provides that the director is vested by operation of law with the title to all property,

contracts and rights of action of the company as of the date of the order directing liquidation. See 215 ILCS 5/191 (West 2006). The duties of the Liquidator, as director of insurance, also are conferred by statutory provisions. Upon an order of insolvency, the Liquidator immediately proceeds to liquidate the property, business and affairs of the insurance company. See 215 ILCS 5/193 (West 2006). The Liquidator may deal with the property, business or affairs of the insurance company in his name as director, or if the court so orders, in the name of the company. See 215 ILCS 5/193(1) (West 2006). In addition, the Liquidator "may bring any action, claim, suit, or proceeding against any director or officer of the company or against any other person with respect to that person's dealings with the company including, but not limited to, prosecuting any action, claim, suit, or proceeding on behalf of the creditors, members, policyholders, or shareholders of the company." 215 ILCS 5/193(3) (West 2006).

The Civil Administrative Code of Illinois also vests powers and duties that are discharged and executed by the director of insurance. The director is charged with the rights, powers and duties pertaining to the enforcement and execution of all the insurance laws of the State of Illinois. See 215 ILCS 5/401 (West 2006).

As another part of the goal of protection through the regulation process, the Insurance Companies here were required to submit annual audited financial reports with the director of insurance. 50 Ill. Adm. Code §925.40 (1991). The annual audit must be performed by an independent certified public accountant or accounting firm. 50 Ill. Adm. Code §925.60(a) (1991). Furthermore, accountants are required to notify the officer or director of the Insurance Companies immediately upon any determination of an adverse financial condition. 50 Ill. Adm. Code §925.100 (1991). Here, the Liquidator sought to recover from BDO for its alleged failure to meet the required professional standards in its performance of the annual audit examinations.

3. The Doctrine of Imputation as Applied to Insolvent Insurers

In this case, BDO argues that the Insurance Companies acted through its officers, agents and employees. As such, according to BDO, both the conduct of those persons when acting within the scope of their duties and the knowledge or intention with which they perform the duties are imputed to the insurance companies. BDO asserts that the fraudulent misreporting of the insurance companies' assets to the Liquidator was perpetrated by Engle and other supporting corporate officers, which must be imputed to the insurance companies as a result. BDO maintains that due to the imputation of conduct, the insurance companies cannot equitably recover from BDO.

Illinois courts have yet to address the issue of imputation of conduct in the context presented in the instant case, namely, during the liquidation of insolvent insurers. Generally, the knowledge and conduct of agents are imputed to their principals. *Metropolitan Condominium Ass'n v. Crescent Heights*, 368 Ill. App. 3d 995, 998 (2006). An exception to this rule exists where the agent's interests are adverse to the principal. *Lease Resolution Corp. v. Larney*, 308 Ill. App. 3d 80, 86 (1999).

A case on point for this issue, *Reider v. Arthur Andersen, LLP*, 47 Conn. Supp. 202, 209-10, 784 A.2d 464, 470 (2001), explains the logic of the adverse interest exception:

> "The general rule is based on the presumption that an agent will be loyal to his principal, and thus will faithfully report to the principal whatever he learns 'while acting for his principal and in reference to a matter in the course of his agency ***.' [Citation.] The principal is thus charged with his agent's knowledge because it is presumed that the principal will actually receive and have the benefit of the agent's knowledge contemporaneously with the agent's actions. The 'adverse interest exception' suspends the operation of the general rule when 'the circumstances are such as to raise a clear presumption that the agent will not perform [his] duty,' and thus that the principal will not in fact receive and have the benefit of the agent's knowledge." *Reider*, 47 Conn. Supp. at 209-10, 784 A.2d at 470, quoting *Resnik v. Morganstern*, 100 Conn. 38, 43, 122 A. 910, 911 (1923).

In *Reider*, the liquidator claimed that the agents' conduct was designed exclusively to loot from the principal insurance company for their own personal financial gain. Monies due the principal for the policies it sold instead were directed to a corporate affiliate that the agents also controlled. From there, the agents were able to withdraw the money for their own private purposes, which were of no benefit to the principal. The court considered the principal to be the victim of the agents' alleged fraud. The court stated that the principal was propped up artificially without sufficient assets so it could continue to attract new business and obtain new credit, the proceeds of which were collected by the agents. The court held that the principal could not be charged with fraud in connection with the acts of the agents since the interests of the agents were always adverse to the principal. *Reider*, 47 Conn. Supp. at 211-12, 784 A.2d at 470-71.

The *Reider* court noted three exceptions to rebut the general rule presuming that knowledge of the agent is imputed to the principal. The first exception is where the scope of the duty of the agent to report to the principal is strictly limited. *Reider*, 47 Conn. Supp. at

210, 784 A.2d at 470. The second and third exceptions involve the adverse-interest rule and fraudulent conduct committed by the agent.

Nevertheless, "[w]hen an agent, by his self-serving conduct, so abandons his principal's interests as to act adversely to those interests, or worse, to act in fraud of his principal, it can fairly be said 'that pro tanto, the agency really cease[s].' " *Reider*, 47 Conn. Supp. at 210, 784 A.2d at 470, quoting *Resnik*, 100 Conn. at 43, 122 A. at 910. Once the agency ceases, " 'the principal is not bound by the acts or declarations of the agent unless it be proved that he had at the time actual notice of them, or having received notice of them, failed to disavow what was assumed to be said and done in his behalf.' " *Reider*, 47 Conn. Supp. at 210-11, 784 A.2d at 470, quoting *Resnik*, 100 Conn. at 434-44, 122 A. at 910. Consequently, a party who knowingly receives and retains a benefit from a transaction that is tainted from fraud cannot later claim that benefit and disavow knowledge of the fraud. Conversely, a party who receives no benefit from the transaction cannot be charged with knowledge of the fraud. *Reider*, 47 Conn. Supp. at 210, 784 A.2d at 470.

Pertinent to this case, "when a corporate officer or agent engages in fraudulent conduct for the distinctly private purpose of lining his own pockets at his corporation's expense, it is unlawful, as well as illogical, to impute the agent's guilty knowledge or disloyal, predatory conduct to his corporate principal." *Reider*, 47 Conn. Supp. at 211, 784 A.2d at 470. The *Reider* court stated that, unless the agent's conduct in pursuit of the scheme somehow benefits the corporation, the corporation cannot be held responsible for the agent's fraud.

The defendant in *Reider* also argued that the adverse interest exception did not apply because the principal was benefitted by the agents' conduct, resulting in the extension of its corporate existence and continued earned income from new customers. The *Reider* court rejected this argument because the principal was looted.

The Seventh Circuit Court of Appeals in *Schacht v. Brown*, 711 F.2d 1343, 1348 (7th Cir. 1983) (applying Illinois law), as quoted by *Reider*, 47 Conn. Supp. at 212, 784 A.2d at 471, further stated on this issue:

> " 'Defendants argue nonetheless that since the alleged fraudulent scheme had the effect of continuing [the insurer's] active corporate existence past the point of insolvency to the detriment of outside creditors and policyholders, [the insurer] was pro tanto benefitted. But the fact that [the insurer's] existence may have been artificially prolonged pales in comparison with the real damage allegedly inflicted by the diminution of its assets and income. Under such circumstances, the prolonged artificial solvency of [the insurer]

benefitted only [the insurer's] managers and the other alleged conspirators, not the corporation.' "

The issue of the sole-owner doctrine also was raised in *Reider*. The defendant there, arguing similarly to BDO here, asserted that the adverse-interest exception does not apply where the agent who loots a corporation is its sole owner and shareholder.

■ The sole-owner doctrine applies under two circumstances. First, the agent must have unbreakable communication with his principal. Because the looting agent and his principal are one and the same, the principal clearly has knowledge of its agent's actions at all times. *Reider*, 47 Conn. Supp. at 213, 784 A.2d at 472; see also *Spindler v. Krieger*, 16 Ill. App. 2d 131, 146-47 (1958). Second, because the sole owner is the only shareholder of the corporate entity, he personally benefits from his own wrongdoing whereas the corporation itself does not. The owner himself, as the sole person whose economic interests are directly affected by the corporation's financial success or failure, is not affected. The *Reider* court explained that "the looted corporation is not so much the owner's victim as it is his tool to defraud third parties." *Reider*, 47 Conn. Supp. at 213, 784 A.2d at 472. Under those circumstances, courts have held that "it is only fair to impute the self-dealing conduct of the looter to the looted corporation." *Reider*, 784 A.2d at 472, citing, *e.g.*, *In re Mediators, Inc.*, 105 F.3d 822 (2d Cir. 1997); *Federal Deposit Insurance Corp. v. Ernst & Young*, 967 F.2d 166 (5th Cir. 1992).

Significantly for the purposes of this case, *Reider* does not involve a typical corporation; rather, the principal is an insurance company. The liquidator there, similar to the Liquidator here, argued that the sole-owner exception cannot apply to insurance companies because of their unique legal responsibilities to policyholders, creditors and the general public. The *Reider* court noted the separate set of rules and strict regulations that govern insurance companies. As in Illinois, Connecticut recognizes the need to afford insurance companies special protections to ensure the public's need for reliable insurance coverage. Annual audits of insurance companies are required and the Insurance Commissioner is given sweeping statutory powers to take action to minimize the consequences from rehabilitation or liquidation. The actions of insurance companies are heavily regulated to preserve solvency in the public interest.

Considering the role of insurance companies and the special protections they require, the *Reider* court held there could not be complete unity of interest between a sole shareholder who loots his own insurance company and the company itself. "Therefore, when a sole owner seeks to loot his own insurance company, every person with

a legally protected interest in the insurer's continuing solvency is not a knowing and willing participant in the owner's fraud." (Emphasis omitted.) *Reider*, 47 Conn. Supp. at 218, 784 A.2d at 474.

The *Reider* court concluded that the fraud of the agents was a fraud upon the principal insurance company, not a fraud by it. "Because the [Insurance] commissioner had the right and duty to take it over and manage [the principal's] affairs on behalf of the public if its insolvency was threatened, the company itself had an enforceable claim against any person or entity who unlawfully contributed materially to its insolvency by violating a legal duty to advise it, either directly or through the commissioner, as to true financial status." *Reider*, 47 Conn. Supp. at 219, 784 A.2d at 475.

We find the holding and reasoning in *Reider* applicable here. Illinois law supports our decision. In *Holland v. Arthur Andersen & Co.*, 127 Ill. App. 3d 854, 866 (1984), the defendant accounting firm argued that the imputation doctrine was applicable to the trustee in bankruptcy. Although misconduct on the part of the defendant may also have been done in a knowing fashion by the principal, there were no allegations in the complaint which established that the purported misconduct on the part of the principal's top management was committed on behalf of the principal. The principal's complaint alleged that the purported misrepresentation served to artificially prolong the principal's business life past the point of insolvency and that various corporate executive personnel would have needed to take steps to at least minimize the damage already sustained had they known of the misrepresentations. Thus, the *Holland* case involved fraud clearly committed by the companies' top management and, as a result, the companies were not able to benefit. The *Holland* court held that the misconduct of the agent could not be imputed to the principal. 127 Ill. App. 3d at 866.

Other jurisdictions have held similarly to *Reider* and *Holland*. See *Cordial v. Ernst & Young*, 199 W. Va. 119, 483 S.E.2d 248 (1996) (rejecting the defendant accounting firm's argument that the rights of a receiver in bankruptcy rise no higher than those of the corporations which they represent and instead finding that the receiver acts to vindicate the rights of the public, including policyholders and creditors); *Bonhiver v. Graff*, 248 N.W.2d 291 (Minn. 1976) (imputation doctrine could not be asserted against the receiver because the receiver represents the rights of creditors and is not bound by the fraudulent acts of a former officer of the corporation); *Arthur Andersen LLP v. Superior Court of Los Angeles County*, 67 Cal. App. 4th 1481, 79 Cal. Rptr. 2d 879 (1998) (holding that the liquidator acts in his capacity on behalf of the public interest and, therefore, is not subject to the

imputation defense that an "ordinary receiver" may face); *In re Integrity Insurance Co.*, 240 N.J. Super. Ct. 480, 573 A.2d 928 (1990) (holding that the liquidator was not barred by the defendant accounting firm's imputation defense because of the "unique situation" imposed by New Jersey's insurance code); *LeBlanc v. Bernard*, 554 So. 2d 1378 (La. App. 1989) (finding that the circuit court erred as a matter of law by placing the rehabilitator of an insolvent insurance company "in the exact shoes" of the insurance company).

In its petition for rehearing, BDO argues that this court should have addressed several cases which they raised in motions to cite additional authority. While we did consider these cases in reaching our initial opinion, we choose to address them now. BDO argues that the holding in *Holland v. Arthur Andersen & Co.*, 127 Ill. App. 3d 854 (1984) (*Holland I*), was modified by the subsequent holding in *Holland v. Arthur Andersen & Co.*, 212 Ill. App. 3d 645 (1991) (*Holland II*). *Holland II* affirmed summary judgment for Andersen against American Reserve Corporation (ARC). In doing so, the court pointed out that Holland, ARC's trustee in bankruptcy, failed to provide "support for a theory of damages as to ARC," as opposed to damages suffered by ARC's creditors. *Holland II*, 212 Ill. App. 3d at 652. The Liquidator in the instant case has presented a theory of recovery for damages to the companies as well as to creditors. We note that the *Holland II* court also rejected the trustee's reliance on cases in which bankruptcy trustees were held to have standing to prosecute creditor's claims. "By the plaintiff's own admission, these cases involved either the fraudulent conveyance of an entity's assets wherein the trustee is empowered by statute to assert the creditors' claims or situations in which the trustee on behalf of the creditors pierced the corporate veil to retrieve assets to be rightfully distributed amongst the creditors in general. These are not the circumstances of this case." *Holland II*, 212 Ill. App. 3d at 653. The instant case involves exactly the circumstances mentioned by plaintiff in *Holland II*.

BDO's petition for rehearing also cites the holding in *Republic Life Insurance Co. v. Swigert*, 135 Ill. 150 (1890), in support of it's imputation argument. We believe that *Swigert* strongly supports our holding that the imputation doctrine cannot apply to the liquidator. In *Swigert*, the state auditor filed a petition against Republic Life Insurance Company under the dissolution statute then in effect. The auditor sought to compel the corporation's stockholders to pay for subscriptions to stock which had been surrendered to the corporation. In holding for the stockholders, the supreme court pointed out that "there were no debts due the company from the stockholders here in question." *Swigert*, 135 Ill. at 175.

The court described the receiver's powers as follows:

"A receiver, *virtute officii*, and without regard to any expansion of his powers by statute or by an authorized decree of court, is only a custodian of property. He is ordinarily, in respect to his title and in respect to the litigations in which he may engage, merely the representative of the owners of the property submitted to his control. But, so far as his powers are derived from a statute or from a lawful decree of court, and the powers do not involve rights which, at the time of his appointment, were vested in such owners, he is not merely their representative, but is the instrument of the law and the agent of the court which appointed him. Such right and authority as the law and the court rightfully give him he possesses, and in respect to such right he is not circumscribed and limited by the right which was vested in and available to the owners.

\* \* \*

Nor is it provided in the statute, nor legitimately deducible therefrom, as is the case in respect to the statutes in force in some jurisdictions, that the receiver may represent creditors, and bring suits to set aside acts of the persons or corporations whose property is in charge of the receivers, which were in fraud of such creditors. The legislature has made no provision of this kind, and in its absence it does not devolve upon the courts, by judicial legislation, to assume a jurisdiction that they have not heretofore possessed." *Swigert*, 135 Ill. at 176-78.

While the pertinent statutes in 1877 did not provide for receivers of insolvent insurance companies to have the ability to file suit to recover monies due the companies with the purpose of then paying the creditors of those companies, this oversight has been remedied by sections 191 and 193 of the Insurance Code (215 ILCS 5/191, 193 (West 2006)). Clearly, the Liquidator possesses the powers granted him under sections 191 and 193 and, in respect to pursuing these rights, "he is not circumscribed and limited by the right which was vested in and available to the owners." *Swigert*, 135 Ill. at 177.

Finally, BDO also relies upon *People v. Bank of Peoria*, 295 Ill. App. 543 (1938). The *Barrett* court held that the Director of Insurance was not permitted to act as a representative of creditors under the pertinent insurance statutes as passed in 1925 and as amended in 1928. Again, sections 191 and 193 now provide for such powers.

Here, the imputation doctrine also cannot apply to the Liquidator where Engle clearly engaged in fraudulent conduct for the distinctly private purpose of lining his own pockets at the insurance companies' expense. We agree with *Reider* and *Holland* that it would be unlawful,

as well as illogical, to impute Engle's guilty knowledge or disloyal, predatory conduct to his corporate principals, the insurance companies or to the Liquidator, who is statutorily charged with preserving the rights of the policyholders and creditors. *Swigert*, 135 Ill. at 178; *Reider*, 47 Conn. Supp. at 210, 784 A.2d at 470; *Holland*, 127 Ill. App. 3d at 866.

As a result of our finding that Engle's conduct cannot be imputed to the insurance companies and, in turn, the Liquidator, we likewise find that the sole-owner doctrine does not apply. The record does not show that Engle had unbreakable communication with the insurance companies. In fact, the record does not make clear the level of communication or operational organization of the insurance companies. In addition, the record does not demonstrate that the insurance companies benefitted from Engle's wrongdoing.

In addition, although we need not reach BDO's argument that the doctrine of *in pari delicto* applies, we address it here briefly. *"In pari delicto"* means " '[e]qually at fault.' " *King v. First Capital Financial Services Corp.*, 215 Ill. 2d 1, 34 (2005), quoting Black's Law Dictionary 806 (8th ed. 2004). *In pari delicto* is intended for situations in which the victim is a participant in the misconduct giving rise to his claim. *In re Edgewater Medical Center*, 332 B.R. 166, 176 (Bankr. N.D. Ill. 2005) (applying Illinois law). "The *in pari delicto* defense exists only because wrongdoers must not be permitted to profit from their wrongdoing." *In re Edgewater Medical Center*, 332 B.R. at 178. Furthermore, the *in pari delicto* defense "loses its sting" once the person who is in *in pari delicto* is removed. *In re Edgewater Medical Center*, 332 B.R. at 177. In *Albers v. Continental Illinois Bank & Trust Co.*, 296 Ill. App. 596, 599 (1938), the court held that the doctrine of *in pari delicto* could not be asserted against a bank receiver, who, similar to the Liquidator, is an administrative officer of the state with rights, powers and duties conferred by statute.

In the instant case, the *in pari delicto* doctrine cannot apply because the Liquidator, by statutory definition, is not the wrongdoer; rather, he serves to protect the insurance industry and the public interest by ensuring the victims of the misconduct can recover monies entitled to them. To equate the Liquidator with Engle under *in pari delicto* is illogical and unavailing. Furthermore, Engle was removed from any potential recovery upon the Liquidator's filing of the Engle federal action. BDO's assertion of the *in pari delicto* defense is rejected.

Accordingly, we find as a matter of first impression that the imputation defense is inapplicable against the Liquidator. This decision is supported by Illinois law and public policy that vests the Liquidator with the statutory authority to liquidate the property, busi-

ness and affairs of the insolvent insurance company in order to protect policyholders and creditors from the type of misconduct which occurred here. See 215 ILCS 5/193 (West 2006); *Coronet Insurance*, 201 Ill. App. 3d at 637-38. In addition, based on our finding that BDO's imputation defense does not apply and, consequently, the underlying doctrines of sole owner and *in pari delicto* likewise are inapplicable, we find that the circuit court erred by dismissing counts I, II and III of the Liquidator's September 22, 2005, complaint against BDO.

## III. CONCLUSION

Accordingly, the Rule 308 certified question is not answered, but addressed by separate holding and the decision of the circuit court of Cook County to dismiss counts I, II and III of the Liquidator's complaint is reversed and remanded for further proceedings.

Certified question not answered; reversed and remanded.

CUNNINGHAM and COLEMAN, JJ., concur.[4]

---

[4]Due to the fact that Justice Alan Greiman, who sat for oral argument, is no longer with this court, Justice Sharon Johnson Coleman shall now become the third panel member. Justice Coleman has reviewed the briefs and oral argument tape in this case.